UNITED STATES, Appellee

v.

JOHN F. VIGNEAULT, Private E–2, U. S. Army, Appellant

3 USCMA 247, 12 CMR 3

No. 2432

Decided August 28, 1953

Samuel Green, Esq., and Lᴛ Cᴏʟ James C. Hamilton, U. S. Army, for Appellant.

Lᴛ Cᴏʟ Thayer Chapman, U. S. Army, Cᴀᴘᴛ Irvin M. Kent, U. S. Army, and 1ꜱᴛ Lᴛ Robert A. Forman, U. S. Army, for Appellee.

## Opinion of the Court

Gᴇᴏʀɢᴇ W. Lᴀᴛɪᴍᴇʀ, Judge:

The accused stands convicted by a general court-martial of two specifications of murder while in the perpetration of a robbery, and one specification of robbery, in violation of Articles 118 (4) and 122, respectively, of the Uniform Code of Military Justice, 50 USC §§ 712 and 716. The specifications charge the accused with the felony killing of Paul Eckart and Lothar Schlosser, German nationals, and with stealing the automobile of Eckart, against his will and by means of force and violence. The charges originally al-

**249**

leged the accused was acting in conjunction with two other soldiers, Richard A. Hagelberger and Robert T. Mierzwik, but the court-martial excepted from its finding the reference to Mierzwik. The death penalty was imposed and has been upheld by reviewing authorities. Our review is mandatory as Article 67(b)(1), Uniform Code of Military Justice, 50 U. S. C. § 654, requires that we review all cases in which the death penalty is affirmed by the board of review.

Approximately 9:30 o'clock on the evening of April 18, 1952, Hans Nesser was driving a truck from Nurnberg to Wurzberg, Germany. As he was approaching Neustadt two American soldiers standing on the side of the road, each wearing a scarf to cover his face, pointed at him what appeared to be an American rifle in an attempt to force him to stop. The threat did not deter him and he drove on hurriedly. He was not sure whether both soldiers had rifles, but he was certain as to one. A short time later, the accused and Hagelberger entered an inn in Diebach, Germany, which is on Highway Number 8 not far from Neustadt. Both had white scarves around their necks. Paul Eckart and Lothar Schlosser, the two victims, entered the inn immediately thereafter and the four men sat together, talked and had a few beers. About midnight, the foursome left together but when they got outside, the two Germans departed in a DKW automobile which was owned by and registered in the name of Eckart, and the two Americans remained on the steps of the inn. The car returned a short time later, the accused and Hagelberger entered and seated themselves in the back seat and the car drove off. During the time the accused was in the inn it was noticed he had a lengthy wrapped package from which a barrel of a carbine protruded. He had the weapon with him when he entered the car.

The accused and his companion were next seen on Highway Number 8, which connects Neustadt and Kitzingen, under the following circumstances. Around 1:30 a.m., April 19, 1952, Franz Feldmann and Miss Frieda Vogt were driving a truck along this highway when at a point about 25 kilometers from Diebach they were forced to stop because of an overturned truck on the road. They stopped rather abruptly and a DKW car ran into the back of their truck. Upon investigation, it was found that two American soldiers were in the car. After Feldmann inspected the damage to his truck, he requested that the two soldiers remain at the scene of the collision until military police arrived. He went forward to view the overturned truck and while he was gone the two occupants of the DKW fled from the scene. Both Feldmann and Miss Vogt identified the accused as one of the soldiers who was in the car that night, although they were not so positive of their identification at a police line-up a few days after the incident.

The bodies of Eckart and Schlosser were found at approximately 1:00 a.m. on Highway Number 8 about two or three kilometers from Diebach. They were separated by a distance of about 500 yards. They were both dead and subsequent autopsies disclosed that Schlosser had three bullet wounds in the left side of his head and parts of his brain had been blown out of his skull. Eckart had four bullet wounds —two in his chest, one on the left side of his navel, and the fourth through the left groin. Both were identified properly and it is undisputed that their deaths resulted from gunshot wounds.

When the car was examined, it was found to be spattered on the inside with human blood and brain tissue. Four cartridge cases were found on the floor and two bullets were found imbedded in the wood in the upper portion of the right-hand door. A third bullet also imbedded in the body of the car was found a few days later. The blood in the car was of the same type as one of the victims.

Shortly after the bodies of Eckart and Schlosser were found, military policemen stationed nearby were alerted and a dragnet was set up to search for the alleged killers. At about 7:00 a.m., April 19, 1952, the accused and his companion were found in a field in the vicinity of Michelfeld,

asleep on the ground. Neither was armed. Apparently after some discussions about the killing, the accused proceeded with several of the searching personnel to an area near Iphofen where a further looking around uncovered the parts of a carbine rifle which later proved to be the murder weapon. All of the parts were found with the exception of the bolt. Two days later the accused, by re-enacting the way in which he threw the bolt on the evening of the killing, led investigators in its discovery. On a subsequent test firing it was determined that this was the bolt which fired the cartridge cases found in Eckart's car. The weapon involved had been issued to a Private Harry T. Owens, who had loaned it to one Mierzwik on the day prior to the killing. Owens identified the gun as being his but his evidence was to the effect that he had not seen the gun between the time he delivered it to Mierzwik and the time of trial.

The accused, a few hours subsequent to his capture and after being advised of his rights under Article 31, 50 USC § 602, gave a full statement of the events of the previous night. He stated in substance that he and Hagelberger had planned on going absent without leave a few days earlier and, because they had no money, they decided to get a gun and rob someone. The gun was procured by a third soldier whose name the accused did not know, and who was going with them, but failed to show up at the appointed time. He did, however, leave a gun at the appointed place and it was picked up by the accused. He and Hagelberger stopped at an inn and talked with the two deceased victims at which time Hagelberger suggested to the accused that they should steal the car belonging to Eckart. Accused agreed to this but with the reservation that he did not want to kill anyone. After getting in the car and after driving a short distance, Hagelberger pointed to one of the Germans in the front seat and motioned for accused to put the gun up to the German's head and shoot. Accused was hesitant at first, but after some prompting by Hagelberger, he shot the first victim in the head. The

driver immediately stopped the car and while he was attempting to escape from the vehicle the accused fired several shots striking him in the chest. Hagelberger then moved into the driver's seat and drove the car a short distance, until it collided with the back end of a truck. Immediately after the collision, the two fled to a nearby field. There they disassembled the carbine and scattered the parts around. They remained in the field asleep until they were apprehended the next morning.

On the day following the giving of the first statement and after being advised of his rights, accused executed a second statement. In this he stated generally that he and Hagelberger took the gun along only to scare people; that they did not have any intention of killing anyone; that he had picked up a box of carbine ammunition the day before his unauthorized absence; that when he obtained the gun he test fired it to make certain it was in proper condition and that it was.

Numerous witnesses were presented on behalf of the accused. All testified as to his past bizarre conduct. His behavior pattern was portrayed by the showing of the following incidents: (a) The accused, a small man, was to fight one of the larger men in his company; the entire fight was a prank being played on the accused; he had previously fought other men and they invariably pretended to be seriously hurt after being hit by the accused; on this occasion, the opponent was to do likewise; however, the accused ran into the fist of the opponent; this caused his nose to bleed and the fight was stopped; and everyone in the unit was in on the prank with the exception of the accused. (b) The accused had numerous periods of crying; on one occasion some of the other men cleaned out his footlocker and threw away several items which appeared to be nothing more than junk; this caused him to cry for some time; at another time, he believed his girl friend had been taken away from him and this caused him to cry; and, an officer observed him crying on guard duty and upon being interrogated for the reason, he said he was afraid. (c) Once he threatened to commit suicide.

**251**

(d) At one time after being ordered to take a shower he was observed standing under the water scrubbing himself with a GI brush with all of his clothes on. (e) After drinking one beer, he often appeared to be extremely drunk and acted eccentric. (f) When his unit went on "the prowl," he acted as air guard and would shoot at imaginary objects along the way and would pretend to be shooting down airplanes. (g) At the enlisted men's club, he placed his hands against the wall, cried, and asked another soldier to loan him $1,000 so he could take his girl home.

In addition to furnishing the previously related evidence, the witnesses who testified for the accused stated he had a mental capacity of about a seven- to eleven-year-old child; that he was the type of soldier who had to have a noncommissioned officer do half of his work and show him how to do the other half; that his appearance was constantly sloppy and his uniform was always dirty; that he had the habit of losing things, although their loss never seemed to worry him. All of these witnesses were non-expert and they expressed no opinion on the mental capacity of the accused to distinguish right from wrong. Trial counsel, however, introduced two doctors, qualified as experts in the field of psychiatry, who stated they had examined the accused. It was their opinion that he could distinguish right from wrong, could adhere to the right at the time of the offense, and was able to cooperate in the defense of his case. In addition, between the time of trial and the hearing before the board of review, accused was observed and examined by two boards of medical officers and one civilian consultant and all concluded he was legally sane.

The trial lasted eight days. The court-martial members deliberated fifty minutes on the question of the guilt or innocence of the accused and two hours to agree upon the death penalty.

Appellate defense counsel have presented eleven separate assignments of error for our consideration. The first alleged· error is based upon the speed with which the entire proceeding, up to and including the convening authority's action, was handled, and the short time which elapsed from the time of the offense until sentence was imposed. He contends that the haste shows an utter disregard for military due process.

The offense occurred on the early morning of April 19, 1952, and the accused was arrested later that same morning. Charges were preferred on April 21, and on the 29th of the same month, the pretrial investigation required by Article 32, Uniform Code of Military Justice, 50 USC § 603, was completed. On April 30, the charges were received by the convening authority and they were referred to a general court-martial for trial the following day. On May 13, the trial commenced and the court pronounced sentence on May 22. The record was received by the convening authority on the following day and his action was completed on June 10. It will thus be observed that a total of 52 days elapsed from the time the accused was arrested until the convening authority announced his action. Based solely upon this total elapsed time, counsel . for the accused contend there could not have been a proper consideration of the case and by virtue of that deprivation the accused was not accorded proper military due process. This contention must be overruled for the reason that accused was only accorded a speedy trial as contemplated and guaranteed by the Sixth Amendment to the Constitution and Article 10 of the Uniform Code of Military Justice, 50 USC § 564.

It is to be noted that defense counsel have set forth no specific examples of how, or in what way, the accused was prejudiced by being tried promptly; and the record fails to bear out their argument that speed equals prejudice. Every step required by the Code and Manual was taken and at any time trial counsel could have moved for a continuance. The pretrial investigation appears to have been regular and proper, and it was not attacked by any motion or pleading for a continuance. The arraignment was not hurried and the trial hardly suggests speed. Had defense counsel, at any stage of the proceeding, believed that more time was

needed, he should have made an appropriate motion. Had he been concerned about the haste, it would have been a simple task to have called that matter to the attention of the law officer.

We may further point out that the trial opened on May 13, 1952, and was not completed until May 22, 1952. The record contains some 710 pages, 36 witnesses appeared before the court, and some of them were called back to testify. Thirteen witnesses appeared in behalf of the accused. There is no showing that any more witnesses were needed or should have been called. One of the doctors who testified that the accused was legally sane was on the witness stand for a substantial period of time. Practically all of the time was consumed in cross-examination by defense counsel. Such a record bespeaks more of deliberate and fair trial punctuated with consideration for the rights of the accused than it does of speedy and ill-considered rulings and lack of due process.

Appellate defense counsel, however, press on us the argument that their predecessor at trial was in no position to ask for a continuance. This assertion seems to suggest that defense counsel would necessarily be hesitant to ask for a delay because of his rank and because the higher military authorities were insisting on dispatch. The difficulty with the argument is that the record fails to support it. The record of trial portrays a competent and conscientious defense counsel and a law officer who afforded the accused every reasonable opportunity to present the facts and theory of his case. Defense counsel was given and exercised wide latitude in his cross-examination of Government witnesses over the objection of trial counsel. Often the scope was greater than is ordinarily warranted in law, and we feel it was done with the sincere desire to assure that no prejudice would result to the accused. Likewise, the cross-examination of trial counsel was narrowed upon objection by defense counsel. The whole atmosphere reflected by the record is not one of hostility toward accused and his defending counsel, and

we are unable to find any reason to believe the latter was cowed or coerced into submission. That the military authorities were not pressing for any sort of a record, that any motion would be considered on its merits, and that defense counsel would make the appropriate motions is borne out by the fact that the trial was originally scheduled to be a joint trial of the three accused persons. Defense counsel made a motion for severance and the request was granted by the law officer. Similar treatment could have been anticipated had any other meritorious motion been made. Accordingly, we see no reason to conclude that defense trial counsel was improperly influenced to the prejudice of his client.

The facts of the case do not establish that due process of military law was denied the accused. No doubt some trials might require more time but others could be disposed of in a much shorter period. The issues involved, the locality of the crime, the availability of witnesses, and a myriad of other factors control the time necessary to prepare properly for the trial of a case. Here on the day he was apprehended, accused executed a pretrial statement confessing his part in the affair. He thus simplified the procedure in determining whether there was probable cause for trial by general court-martial. Psychiatric examination was readily available and all of the witnesses were interviewed and the evidence accumulated within a matter of a few days after the killing. In summation, we can say that no good reason has been suggested to as why the law officer erred in not ordering an unrequested continuance. From his point of view, all of the witnesses were close at hand, available for interview by defense counsel, the issues were narrow, and sufficient time had elapsed to permit defending counsel to prepare adequately any defense available to accused.

One additional factor which appellant asserts is conclusive that he was denied a fair and just trial is the short period of time used by the court-martial in returning findings and sentence. To sustain this contention would require

us to indulge in the wildest speculation. The court-martial deliberated for fifty minutes to reach a finding. While the trial took eight days, there was very little controversy over the facts. The accused had confessed to the crime and there was no dispute in the evidence. The entire defense theory was a claim of immaturity and bizarre behavior. Accused's sanity was not a substantial issue. The posture of the evidence was such that a finding of guilt would likely be arrived at in short order. The prosecution had presented all the elements of a felony murder committed by the accused; the defense presented the story of an anti-social youth. Fifty minutes was ample time to consider such a factual picture. The sentence presented the only real subject for serious consideration. To forfeit the life of a youth causes anyone to pause and reflect; but we cannot say that two hours is not a reasonable period of time for men to arrive at that conclusion.

Accused next attacks the findings on the ground that a fair and impartial trial was precluded by the general atmosphere of hostility and partiality surrounding the trial. It is his contention that he was, in fact, placed upon the sacrificial altar to satisfy the demands of the German people who were registering vehement objection to the American method of administering justice. The assignment is predicated upon certain remarks of defense counsel and upon newspaper stories published in the Army paper, "Stars and Stripes." In his closing argument to the court-martial, defense counsel stated the case had received considerable notoriety in the German papers who had misinterpreted our system of justice. In the same argument he referred to symptoms of partiality on the part of the German audience who attended the trial. Aside from the two afore-mentioned items, the record of trial is barren of any hint that hysteria, partiality, or emotional excitability gripped the courtroom, or that German publications had even publicized the trial. While defense counsel at the trial suggests the possibility of emotional outbursts, they were not of sufficient importance for him to ask that spectators be directed to observe appropriate courtroom decorum or to suggest that the courtroom be cleared. Those are rights which an accused can exercise. Manual for Courts-Martial, United States, 1951, subparagraph 53e. However, the Manual further grants the accused a public trial and unless he protests, or good cause for secret sessions is shown, the proceedings are open to spectators. We find nothing in the record which indicates that anyone at the trial level was concerned about any incident during trial. The reasons which may have prompted defense counsel to make the statement could be one of many. However, from the argument that followed, it seems reasonably certain he was emphasizing that the members of the court-martial must be convinced beyond a reasonable doubt before they could convict the accused, and that they should not be influenced by matters not found in the record. How far, if at all, the incidents were exaggerated for effect does not appear but, viewed in the background of this case, the mere mentioning of symptoms of partiality by defending counsel falls far short of establishing they had any impact on the minds of the members of the court-martial.

Appellate defense counsel have presented to the Court several copies of the American service paper, "Stars and Stripes," which carried stories of the trial. It is contended these show that military authorities were making an example of the accused. While the papers are not properly before us, we have, for the purposes of this case, taken note of them. We fail to see anything of possible influence in them. They are no more than factual reporting of news. They do not embellish the happenings of the trial and they are not false or inflammatory. They reported fully and fairly the events of the investigation and trial as they proceeded and, for the most part, the articles were published on inside pages. They make no attempt to influence the reader against the accused and they do not editorialize upon the merits of the

trial. This case has no reasonable resemblance to those in which it has been successfully contended that the accused was first tried by the newspapers. Were we to sustain the contention, we would either render military investigations and trials secret or we would reverse every case reported in the press.

With regard to the complaint concerning reports carried in the German papers, we have no way of knowing what they published. Neither has there been any showing that any members of the court were apprised of the contents of any article. Defense counsel was given ample opportunity to question court members on *voir dire* examination as to whether they had read any articles, whether they had received any prior information concerning the facts of the case, or whether they had formed any opinions as to the guilt or innocence of the accused. The members, when questioned on those or allied subjects, expressed the opinion that their minds were open and they could fairly and honestly try the issues. Most members of a court read the daily papers but a showing that newspapers published stories about an offense, without more, does not establish that a court-martial has been influenced by them. Possibly Mr. Justice Holmes had the answer to most of accused's contentions when he observed in Holt v. United States, 218 US 245, 251, 54 L ed 1021, 31 S Ct 2, 20 Ann Cas 1138:

". . . . If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day. . . ."

One further item on this group of assigned errors. Accused complains there could not be an impartial hearing because of the fact that his trial was held in the palace of justice where the Nurnberg war criminal trials were held. We find no significance in this. Many cases are tried and many courts-martial assemble in that building. The mere fact that notorious trials were held in the courtroom by no means renders it an arena unfit for later prosecutions. We suspect the evidence, not the locale of the trial, brought about the conviction.

Accused next raises the point that the pretrial statements of the accused were not admissible in evidence. He bases his argument on the facts that accused is easily led; that he is of low mentality; that he will sign anything placed before him; that there were officers present at the interrogation; and, that the statement was not taken down verbatim, but only the substance of his confession was recorded. The evidence presented to the court made it clear that the accused was fully apprised of his rights under Article 31 of the Code, *supra*. No threats were advanced, accused was in no way coerced, and the statements were not extracted by promises of leniency. All of the facts and circumstances surrounding the making of the statements were before the court members under appropriate instructions which fully informed them to disregard the statements, if they decided they were not given voluntarily. There is nothing in the record to indicate that the statements might be untrustworthy because they were not made as a matter of free choice of the accused. After the first statement was typed, it was given to him and he had ample opportunity to read and know its contents. The second was in his handwriting. The facts *aliunde* the confessions testify to the truth of their contents. One item only need be mentioned. There is too much similarity between the nature and location of the wounds as found on the bodies and the manner of shooting as outlined in the confessions to lead to any conclusion other than that they were founded in truth. The fact that an accused is easily led or is of low mentality does not make his statements inadmissible. It may well be that less coercion would be necessary to render the statements involuntary and so, if in working on a person of that calibre, a confession is coerced or rendered involuntarily, even though a stronger willed man would not have succumbed, it is inadmissible. However, in this case there is no showing that

**255**

any coercive measures were taken or that, because of his low mentality, the conduct of the investigating officers resulted in a forced confession.

Appellant seeks to have the confessions disregarded for he argues that we should find that the warning against self incrimination was not given to the accused prior to his confession because some of the individuals present at the time the statements were made were not called as witnesses. We see no necessity for calling a number of witnesses to establish an issue which is not in dispute. Trial counsel had previously established overwhelmingly that a warning had been given. It is not necessary for him to fill the record with cumulative evidence. While it is true the Manual requires him to call all material witnesses, whether their evidence be favorable or unfavorable to accused, at the same time this provision must be interpreted in the light of common sense. Primarily, it is to assure the production of all relevant evidence which will assist the court-martial in determining the ultimate truth. In addition, the rule may prevent trial counsel from consciously concealing evidence which might be favorable to an accused. However, if a number of witnesses would all testify to substantially the same facts, there is no necessity that the Government call all of them. That evidence is cumulative is a valid objection to its admissibility and the record need not be filled with repetitious testimony. In the instant case, appellate defense counsel only assert the testimony of uncalled witnesses might have been different from that which was presented to the court. They ask us to indulge in that presumption which, of course, we cannot do. It may be that in certain instances where evidence is known to, and solely within possession of, one party, and it is not produced, it can be presumed it is unfavorable to the party who should furnish it. That rule avails the accused naught in this instance for the reason that the witnesses were known to both parties and anyone or all could have been called by the defense. Under those circumstances,

there is no requirement that the Government call any more than trial counsel believes necessary to prove the issue. Certainly, before this error may be successfully asserted on appeal, it must affirmatively appear that the testimony would do more than corroborate that which was already in the record. That showing is not presented to us and so the assignment is overruled.

The next contention complains because Prosecution Exhibit 2, a carbine, was admitted into evidence. The alleged basis for this complaint is that it was not connected up with the accused. We think the evidence discloses the contrary beyond all reasonable doubt. The gun was charged to one Owens who loaned it to Mierzwik; the accused in his statement largely corroborates this by admitting that a third soldier was to get the gun for him and Hagelberger; the weapon was later identified by Owens as being his; according to ballistic experts it was the gun which fired the fatal shots; Owens did not see the gun from the time he loaned it until trial; accused admitted field-stripping the gun and throwing the parts away; the parts were found disassembled in an area traversed by him; he aided prosecuting officials in finding the bolt to the gun by displaying the manner in which he had thrown it away; and, he was seen carrying a carbine just prior to the murder. Such facts leave no room for doubt as to his connection with the lethal weapon.

It is strenuously asserted that the evidence of the attempted robbery of Nesser earlier in the evening of the killing should have been stricken from the record as requested by defense counsel for it was prejudicial to, and it too was not connected with, the accused. As a general rule, evidence of prior criminal acts should not be admitted. There is, however, a well recognized exception in those cases where it tends to show motive or intent. Manual for Courts-Martial, United States, 1951, paragraph 138g. The accused was charged with robbery and murder in the perpetration of the same

256

crime. The evidence shows that he was in the vicinity of this incident at approximately the time of the occurrence. His pretrial statement admitted a plan to rob and the gun was to be used to frighten the victim. Nesser identified the men as two soldiers wearing American uniforms, carrying a carbine, with their faces partly covered with a mask. The accused and Hagelberger later were seen in that same general area with scarves around their necks and this was not a part of the usual military attire. The accused was carrying a gun when he went into the inn and his pretrial statement admits planning to steal a car. The attempted stopping of Nesser at the point of a gun shows clearly an intent on the part of the two soldiers to rob at any cost. This brings the questioned evidence under the exception to the rule. Moreover, the circumstantial evidence of identity was sufficiently strong to permit the court-martial to conclude the accused was one of the two involved in the first attempt.

A minor contention is to the effect that the trial court erred when it admitted into evidence the ▮▮▮▮▮▮ clothing which accused wore on the night in question. Without being warned, he was asked by CID agents to remove and write his name on his field jacket, which he did. The only purpose in having him sign his name was to subsequently identify the clothing. It was not obtained to use for comparative purposes. Article 31 of the Code, *supra*, does not apply as the jacket could have been marked by anyone else present and a proper identification made and the accused voluntarily performed the act of signing.

The next assignment of error questions the law officer's ruling that the bolt to the murder weapon ▮▮▮▮▮▮ was admissible into evidence. During the first search of the area it was not found; but at a later time the accused offered to assist in finding it. He had been warned of his rights under Article 31 on three prior occasions. The accused directed the agents of the CID to the area and then threw a pocket knife in the manner he had thrown the bolt. It was found a few feet from where the knife landed. Defense counsel contend that, notwithstanding the warning, there was such an array of force present that the accused was not given a free choice. During the time there were four military policemen, two highway patrolmen, two soldiers with mine detectors, and two sergeants of the CID present. The law is well ▮▮▮▮▮▮ settled that the mere fact the accused was in custody or confinement at the time of giving the statement does not render it inadmissible. Hopt v. Utah, 110 US 574, 28 L ed 262, 4 S Ct 202; Sparf v. United States, 156 US 51, 39 L ed 343, 15 S Ct 273; Pierce v. United States, 160 US 355, 40 L ed 454, 16 S Ct 321. In the instant case the authorities were hunting through the area to find an important but hard-to-discover piece of evidence. There is no showing and no reason to assume such an array of force was to compel an admission. On the contrary, that was unnecessary, as the damaging statement had been previously given and the number of people and the equipment involved suggests merely an attempt to expedite the finding of the missing part.

It is next asserted that the evidence is insufficient to support the findings of robbery for only in the confession is there any evidence that the accused obtained possession of the car by means of force and violence. This requires little comment. While there was no eyewitness to the theft, all the evidence points to but one conclusion—that the car was taken by force and violence. Earlier in the evening the accused attempted to rob one German of his car, thus disclosing an intent to commit a robbery. He had a gun with him at all times. He was seen entering the car with the victims just prior to the time they were found dead. The owner of the car was found on the side of the road brutally murdered. The accused was later seen in the stolen automobile, at which time it was covered with blood. He and his companion fled the scene when they were told the military police would have to be summoned and they later disposed of the murder

**257**

weapon. The manner in which the victims met their deaths shows conclusively that force and violence were used to obtain possession of the car and there is no question but that the intent to permanently deprive the owner of his car is established.

Appellant lastly asserts that the instructions given in this case were inadequate. We arrive at a contrary conclusion. The court-martial was fully instructed on the elements of the offense charged as required by Article 51(c) of the Code, 50 USC § 626. It was also instructed fully on all the lesser included offenses of the crime reasonably raised by the evidence as required by numerous decisions of this Court. Although the evidence did not demand it, the court-martial was instructed on the effect of intoxication on specific intent. Moreover, the law officer carefully covered insanity by informing the court-martial members that they must find the accused legally sane before they could find him guilty and they were given the proper guideposts to guide them in their deliberations on that issue although we find no real contest over accused's sanity. United States v. Burns, 2 USCMA 400, 9 CMR 30, decided April 15, 1953. The law officer fulfilled all duties imposed by Article 51(c) of the Code in instructing the court on reasonable doubt and the burden of proof. In short, he fulfilled all the duties imposed on him by the Manual, the Code, and this Court. If defense counsel was desirous of having him do more, the burden to so request falls on defense counsel. Having failed to do that, any omission on the part of the law officer to define or explain further cannot be raised for the first time on appeal. United States v. Day, 2 USCMA 416, 9 CMR 46, decided April 30, 1953.

One other matter of some importance bears consideration. There was considerable lay evidence offered that accused was mentally deficient. It did not, however, raise an issue that accused was legally insane and all the expert evidence is to the contrary. Mental examinations were made both before and after findings and sentence. Two medical officers at the trial expressed their opinion that accused was sane. Between the date of conviction and the hearing before the board of review, other examinations were given him. In every instance he was pronounced legally responsible for his acts. The court-martial found the accused sane and the board of review, with additional facts before it, did likewise. Accordingly, that issue is settled contrary to accused's contention.

We have answered most, if not all, of the arguments made by counsel for accused. From those discussed, it should be apparent that if any are omitted they are of little importance. This is a mandatory appeal because of the death sentence, and, for that reason, we have considered many errors which in cases with lesser punishments would go unanswered. Viewing the record from its four corners, we are satisfied that the accused was convicted without there being any error which materially prejudiced his substantial rights.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.