UNITED STATES, Appellee

v.

RICHARD A. HAGELBERGER, Private E–1, U. S. Army, Appellant

3 USCMA 259, 12 CMR 15

No. 2651

Decided August 28, 1953

LT COL George M. Thorpe, U. S. Army, for Appellant.

COL Allan R. Browne, U. S. Army, LT COL William R. Ward, U. S. Army, CAPT Irvin M. Kent, U. S Army, and 1ST LT Robert A Forman, U. S. Army, for Appellee.

Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was charged with and found guilty of two specifications of murder while in the perpetration of a robbery, proscribed by Article 118(4), 50 USC § 712, and one specification of robbery proscribed by Article 122, 50 USC § 716. Both Articles are part of the Uniform Code of Military Justice. The court found him guilty of all specifications and charges and imposed the death penalty. The case is before this

260

Court on mandatory review pursuant to Article 67(*b*) (1) of the Code, 50 USC § 654.

The specifications allege the accused acted in conjunction with Private John F. Vigneault, who was tried separately, found guilty, and also sentenced to die. The essential facts of this case are spelled out in Vigneault's case (United States v. Vigneault, 3 USCMA 247, 12 CMR 3, decided this date), and because they can be readily ascertained by referring to that opinion they will not be repeated. However, those differences which are of some importance will be noted. In addition, we quote accused's first confession as it is the best evidence of the mental attitude with which he participated in the killing. After the warning paragraph, the confession continues as follows:

"On 17 April 1952, about 2300 hrs, John VIGNEAULT and myself went AWOL from our organization, which was at that time stationed in Grafenwohr (tent city) on maneuvres. There was another soldier supposed to go with us but he never showed up. I met VIGNEAULT in the back of the washroom, after which I picked up my cargo bag which had my fatigues and toilet articles, then VIGNEAULT went to the next building to get the carbine. I knew he was going to bring a carbine, because the other soldier, whose name I do not know, and who was also going to go AWOL with us, said that he was going to bring a carbine so he could go hunting while AWOL. I had approximately $15.00 in script and VIGNEAULT had no money. We took a taxi from Grafenwohr Post to Weiden. I paid about $3.50 for the taxi. We then walked in the direction of Nurnberg for about one and a half hours. We spent the night in a small shack next to the road. The next morning we got a lift from the German Police, who got a ride for us later on, in a German truck, which took us to Nurnberg. We took an ET taxi from Nurnberg to Neustadt/Aisch. I paid for the cab $8.80. After that we started to walk in the direction of Kitzingen. We walked approximately half an hour, then we layed down and slept until about 2030 hours. We then again started walking in the direction of Kitzingen. When we reached a small village, we entered a guesthouse. VIGNEAULT and I started to drink some beer, two German civilians called us over to their table. One of these civilians spoke good English. My buddy and I drank a total of three beers each. When the guesthouse closed, we went outside and the two German civilians came outside too and asked us if we wanted a taxi to go to Wurzburg. We did not have enough money, but I was of the opinion that the driver of the taxi was going to take the young German civilian to Neustadt, leave him there and then come back and pick us up and take us to Wurzberg and there my buddy and I would just take off, so I told the driver that we would take the taxi to Wurzberg. When the taxi returned from Neustadt, both German civilians were in the car, so I changed plans by talking it over with VIGNEAULT. We decided that we would get into the cab with both the civilians and then a short distance from town we would shoot both of them and take the car for our own use. VIGNEAULT and I entered the cab and sat in the back seat. VIGNEAULT sat directly behind the driver, holding the carbine on his lap. When we were a short distance from the village, I nudged VIGNEAULT, then pointed at the driver of the car and shook my head, indicating that he was not to be shot first, I then pointed at the German civilian, riding next to the driver and signaled that he was the one to get it first. VIGNEAULT then lifted up the carbine and pointed it at the head of the German civilian, riding next to the driver, at which time I said 'anytime you are ready'. VIGNEAULT then pulled the trigger two or three times. The driver of the vehicle then stopped the car and started to get out. I started to grab him but missed him. I then went over the front seat into the driver's position. While I was doing this, VIGNEAULT fired at the other German civilian, who was outside of the car. The civilian outside the car, after

VIGNEAULT shot him, was still hollering and hanging on to the door, I then pushed his hand off the car and he fell on the ground. I got the car in gear and started forward in the direction of Kitzingen. I drove about four or five minutes, I stopped, reached over, opened the door and pushed the other civilian out, who was still in the car. I then kept on driving towards Kitzingen until I struck the back of a truck. After the automobile accident VIGNEAULT and I went into the woods and VIGNEAULT took the carbine and scattered the parts in a small area. I changed from my Class 'A' uniform into fatigues because my uniform was full of blood. I realize that when you point a loaded carbine at a man's head and pull the trigger, he will die. We had no intentions of just wounding the German civilians, and we fully intended to kill them, so that they could not report that we had stolen the car."

Generally speaking there are three important factual differences between the two cases. The first is that a portion of a cigarette was found in the DKW car and the accused was further linked to the crime by expert testimony which identified a blood fingerprint on the cigarette as being his. The second is that a field pack belonging to the accused, which contained the blood covered clothes he wore at the time of the offense, was admitted in evidence. The last is that in this case no witnesses were called by the defense and hence no showing of mental immaturity. With these differences in mind, we pass on to consider the assignments of error urged by appellate defense counsel.

It is first asserted that the confession of the accused should not have been admitted into evidence because it was not voluntary. The contention centers around a claim that nervousness on the part of the accused, plus the presence of officers, produced mental compulsion. We are not impressed with the argument. A mental condition, not the product of acts of third parties, may cause a person to confess his sins, but if a statement is given to clear one's conscience, it is not inadmissible because

of being involuntary. A confession to be inadmissible must be one which has been obtained by some form of coercion, compulsion, unlawful influence or unlawful inducement. In this instance the investigating officers did not offend against that principle. The accused was fully apprised of his rights under Article 31, 50 USC § 602, and there is no assertion to the contrary. He was fully advised that he need not give any statement, and that if he did, it could be used against him. The accused responded by stating that he fully understood his rights. Evidence of force, threats or promises is lacking and no specific act on the part of any interrogator which smacks of coercion is mentioned. Of course the accused was nervous and fearful but this was undoubtedly occasioned by the horrors of the killing and the dread of the consequences. Even were we to assume some dispute in the evidence, the law officer fully and fairly instructed the members of the court-martial that the admission of the confession did not foreclose its consideration by them as the final determination as to its voluntariness and weight rested with them. In short, the record fails to support the contention advanced.

Next, it is asserted by accused that failure of trial counsel to call certain witnesses who were present on the occasions when accused made his incriminating statements renders them inadmissible. We considered the same contention in the *Vigneault* case, and concluded it was without substance. As we stated in that case, the Government was under no duty to call additional witnesses to further support an issue which was not in dispute. Moreover, the witnesses were available and known to the accused and if he believed their testimony would aid his cause he should have requested that they be made available as witnesses for him.

Accused forcefully argues that a witness, Master Sergeant George A. Gordon, should not have been allowed to testify as a ballistic expert because he lacked the necessary experiential qualifications. Sergeant Gordon testified

that two bullets found in the stolen car were fired from the same carbine which was identified as the one possessed by Vigneault and the accused. Of necessity, our first inquiry is to what extent this Court will review a determination by a law officer that a witness is qualified to testify as an expert. The civilian authorities support two different rules—the first is that an appellate court will not review the trial judge's determination, and, the second is that there will be a review but it is limited to a determination of whether there has been an abuse of discretion by the judge. Wigmore, Evidence, 3d ed, § 561. The Federal courts have generally adopted the second rule. Congress and Empire Spring Co. v. Edgar, 99 US 645, 25 L ed 487; Hodge v. United States, 13 F2d 596 (CA 6th Cir); United States v. German-American Vocational League, 153 F2d 860 (CA 3d Cir). Reason supports us in adopting the latter rule even though excellent arguments are advanced by Professor Wigmore to sustain the former. In the military scheme of judicial administration, law officers should not be untouchable, and if they err in their rulings on interlocutory questions, this Court should not refuse to review.

The rule with respect to the standards a witness must meet in order to establish his qualifications to testify as an expert on a subject is stated in Underhill's Criminal Evidence, 4th ed, 1935, section 243, pages 458 and 459:

"There are no prescribed standards for such qualifications, other than that the witness must have a certain measure of special experience with the subject matter. Courts regard ballistic experts as they do any other expert, and where the qualifications of a ballistic expert meet with the court's approval, his evidence is admissible if stated as his opinion and not fact, and the qualified expert witness may range from the local gunsmith, or even one who has made guns his 'hobby,' to a highly trained specialist in ballistics."

The accused in this instance not only had the benefit or having the law officer determine that Sergeant Gordon met the necessary standards, but in addition, the board of review made an independent finding of fact to the same effect. Because the board of review carefully weighed the evidence to arrive at its decision, we quote that part of the opinion which recites the facts brought out at the trial.

". . . In response to questioning, Sergeant Gordon testified that he was a college graduate with 'cross majors' in business administration and civil engineering; that for five years he worked in manufacturing concerns, one of which was a jewelry concern and one which manufactured the Johnson semi-automatic rifle; that in the jewelry concern he 'laid out' and supervised the work, that in the rifle concern he supervised the subassemblage and flow of parts into the completed rifle; that he entered the Army and was an armorer with duties consisting of the maintenance and repair of small arms; that later and for a period of three years he worked in the Naval Ordnance Laboratory where he prepared explosives for experimental purposes; that he again entered the Army, his enlistment being particularly for work in firearms identification; that he then attended the Criminal Investigation Detachment School which included a three hour course in firearms identification; that upon completion of school he began work in firearms identification in the crime laboratory at Frankfort under the supervision of experts; that he has been engaged in the identification of firearms since November 1948; and that since November 1948 he has 'handled' between four hundred and five hundred cases in firearms identification in court."

In view of the careful consideration given to Sergeant Gordon's experiential qualifications by both the law officer and the board of review, we cannot find the former abused his discretion in permitting the Sergeant to testify.

It is next argued that the law officer erred in failing to strike the testimony

**263**

of Master Sergeant Morgan who testified as an expert on fingerprint identification. He stated that the fingerprint on a cigarette found in the stolen car matched those of the accused. While this particular objection was not raised at the trial, it is now contended that this witness invaded the province of the court-martial for he testified to an ultimate fact; that he was not expressing an opinion, and, therefore, he removed a factual issue from the court-martial. That statement does not reflect our version of the record. The examination was conducted in such a manner that the court-martial members were free to accept or reject the conclusion of the Sergeant. He was only expressing an opinion based on the results of his investigation. The questions and answers were phrased in the following vein: "Now, Sergeant, as a result of your examination or comparison did you form an opinion as to whose fingerprints appeared on the cigarette? A. I did. The fingerprint on the card was made by the same person that made the fingerprint on the cigarette." The answer of the Sergeant was only his belief, his opinion, or his best judgment. That was all the question asked for. Paraphrased, his answer was that he had formed an opinion that the fingerprints on both the card and the cigarette belonged to the same person. The ultimate fact as to whether they were one and the same person was left to the court members. They could accept or reject his conclusion depending upon the credence they saw fit to give to the Sergeant as an expert in his line.

It is contended that certain items of real evidence should not have been admitted for they were not sufficiently connected with the accused. The argument sums up to a declaration that the chain of custody was not completed. The first exhibit brought under attack is the cigarette butt which was found in the stolen car. If it were necessary for the Government to rely on completing a chain of custody to identify the exhibit, there might be one link missing in the chain; but that is not the basis of the

law officer's ruling. The exhibit was adequately identified by Richard Stawicki of the Criminal Investigation Detachment who testified as follows: That he found the exhibit in the stolen automobile; that at that time he placed it in an envelope; that he did not write upon the cigarette because of its fragile condition; that the envelope was sealed in his presence and in the presence of a Mr. Sanders, another agent; that Sanders wrote his name across the back of the envelope; that he was able to identify the envelope by the signature and the cigarette by virtue of certain characteristics; that one of the distinctive features of the cigarette was it had a fingerprint in blood impressed upon it; that it was the only one the witness had ever seen with that kind of marking on it. It would indeed be a rare occasion that two cigarette butts of similar characteristics with identical blood markings would be found in the same area in a short period of time. Exhibits should be identified before being admitted in evidence but regardless of the test employed to determine adequacy of identification, it is more than met here.

The next questioned exhibits were the two bullets which were found imbedded in the stolen car. Stawicki found them, and for identification immediately marked them with the initial "R." Subsequently they were turned over to the crime laboratory for testing purposes. Stawicki recognized them at trial by his identifying marking, by their characteristics, and by the fact that there was no other litigation pending at that time which involved a bullet of that calibre.

The last exhibits which are concerned with this particular contention are a test bullet and a photomicrograph. Accused claims lack of appropriate foundations to support their admission into evidence. The bullet was test fired from the murder weapon, and the photomicrograph was taken to compare the markings on the test bullet and the bullet found in the stolen automobile. Sergeant Gordon stated that he test fired the gun, and immediately marked the

bullet with 52–393–T3–GG. The markings standing for the year, the case number, the test number, and his initials. After firing the test bullet, he placed it under the microscope, along with the other bullet, and took a photomicrograph of the similarities. He then developed the negative of the film, marked the picture, and placed the exhibits in a case file. The weapon from which the bullet was fired was otherwise identified as the one used in the killing and the Sergeant identified the bullet and the photomicrograph. We are unable to find any merit in this assignment.

The next assignment of error seeks to establish that it was prejudicial error to permit a doctor, who qualified as a medical expert, to answer a question as to whether the muzzle of the carbine was close to the head of the ■ victim when it was fired. The doctor replied that it was his judgment it must have been held only a few centimeters away. No objection to the question or answer was made by defense counsel at trial, and it should not be considered for the first time on appeal. We will point out, however, that even in the face of an objection the answer would not have been inadmissible. State v. Voorhies, 115 La 200, 38 So 964; State v. Johns, 152 Iowa 383, 132 NW 832; State v. Gruber, 150 Wash 66, 272 Pac 89. Relative distances can, in certain instances, be determined by the presence or absence of powder burns and other markings on the body and a medical expert can detect their presence. All the evidence shows the muzzle of the carbine was practically touching the victim when it was discharged and the basis for the opinion would be present. While the evidence has little, if any, materiality in this case, its admission was not error.

We can combine the next two assignments of error which urge that, even though unrequested, there ■■ should have been instructions by the law officer on two issues: (1) the effect of intoxication on specific intent; and (2) the burden of proof on the question of insanity. The rule is that, if there is some evidence which raises intoxication or insanity as an issue at the trial, an instruction must be given. That rule defeats accused as neither of those matters was placed in issue at the trial. In discussing the type of evidence which will raise an issue of intoxication, we stated in United States v. Backley, 2 USCMA 496, 9 CMR 126, decided May 12, 1953:

". . . . Evidence which goes no further than to indicate merely that the accused 'had been drinking,' or that he was 'under the influence of liquor,' is clearly insufficient to require an unrequested instruction on intoxication. . . ."

The evidence in this case goes no further than that. The only evidence we find touching on that issue consists of testimony that accused had consumed three half liters of German beer which contains twelve or thirteen per cent alcohol. The record is entirely devoid of testimony that he was under the influence of intoxicants. Witnesses were not called on his behalf to show his physical or mental condition, and, on cross-examination, defense counsel made no attempt to have other witnesses state their conclusion as to his condition. We think probably the most illuminating bit of evidence that whatever drinking accused indulged in did not rob him of his capacity to form a specific intent, can be found in the details of his own confession. A reading of it leaves little doubt that the robbery was conceived and committed with a mind which was little fogged by alcohol. When a person can remember the number of drinks consumed and the amounts of money expended for different cab fares over a period of time, his mind is functioning reasonably well. Moreover, to remember details which are independently established as being true hardly shows mental impairment. These are only part of the acts he relates. While he and his companion sat on the steps of the Inn at Diebach waiting for the two victims to return and pick them up, he planned and outlined the details of the crime. Upon entering the car, he carried out his preconceived plan by pointing to one of the victims and by shaking his head, indicating that the driver should be shot last. He then pointed to the other one-

265

and said "anytime you are ready." After Vigneault shot the two Germans, the accused moved to the front seat, drove the car away, attempted to avoid detection by fleeing, and concealed incriminating evidence by hiding his clothes and disbursing parts of the carbine. The vividness with which the incident is pictured by the accused in his confession undermines the contention that he was so intoxicated he could not form the requisite intent.

The issue of insanity meets the same fate. An accused is presumed sane at the onset of his trial, and before there could be any issue, he must produce some evidence to the contrary. In the case at bar, before plea was entered, a request was made that the accused be given a psychiatric examination. He was ordered before a board of medical officers for that purpose. The examination was conducted and the findings established that he was legally sane; that he could distinguish right from wrong; that he was able to adhere to the right; and that he was able to assist in his defense of the trial. No further examination was requested, no other testimony on the subject was produced, and the issue was not pursued by defense counsel. The entire matter lay dormant until on appeal when it was contended that there should have been a more complete instruction on the issue. Obviously, that was unnecessary, as an issue of fact was not created in the trial forum. The only evidence which was presented there was that the accused was sane.

The final assignment of error urged is that there could not be a fair and impartial trial because of the mob hysteria which was present during the pretrial and trial proceedings. We considered this same assertion in the Vigneault case and concluded there was no evidence to frame such an issue. The same is true here. Nowhere in the record of trial is there any indication that the trial was not conducted in an orderly, quiet, and calm manner. Counsel for accused must have been satisfied that the proceedings met the tests of legal decorum and dignity as he did not seek a change in place of trial, he did not place in the record any evidence of disorder, and he expressed no dissatisfaction with any pretrial proceedings. In short, there are no facts to bear out the accused's contention.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.