UNITED STATES, Appellee

v.

JOHNNIE L. FORD, Corporal, U. S. Army, Appellant

4 USCMA 611, 16 CMR 185

No. 4192

Decided August 6, 1954

LT COL Herman P. Goebel, Jr., U. S. Army, MAJ Edwin Doran, U. S. Army, and 1ST LT David J. Conroy, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Corporal Johnnie L. Ford was convicted by general court-martial of wrongfully using morphine, a habit-forming narcotic drug, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The convening authority approved the sentence but suspended execution of the punitive discharge until the accused's release from confinement or until completion of appellate review, whichever is the later date. Following affirmance of this action by a board of review, we granted the accused's petition for review to determine the sufficiency of the evidence to sustain the conviction.

Under circumstances which are not entirely clear from the record of trial, the accused was requested by agents of the Criminal Investigation Division to give a sample of his urine for analysis. He complied and the specimen so obtained was delivered to the 406th Medical General Laboratory, Tokyo, Japan. There, the preliminaries to final analysis were performed by Corporal Laffan, a laboratory technician, who holds a degree of Bachelor of Science in Chemistry, and prior to his entrance into the military service had completed twelve hours of graduate study in biochemistry. Prior to this trial he had been engaged as a chemical laboratory technician performing the tests herein involved. Testifying by deposition, he described this phase of the procedure as follows:

"The urine specimen is made very acid with hydrochloric acid, put in the autoclave for hydrolysis. It is hydrolized for 30 minutes at 15-pound pressure. Sample is then taken out of the autoclave, is filtered through paper, made extremely basic with sodium hydroxide, and chloroform is added and the specimen is shaken with the chloroform. The chloroform is then allowed to settle out; the cholorform extract is taken from the specimen and filtered to take out the water which may be in it, and the chloroform extract is then evaporated down. Following this, hydrochloric acid is added to the specimen again to lower the PH and a second extraction with 10% ethynol in chloroform is made. Again this extract is taken from the bottle—from the flask and evaporated down."

Before performing the described extraction, he checked all the laboratory equipment involved and determined that it was clean and free from contamination. During the course of this process, the specimen was not contaminated in any way. Upon the completion of this phase of the operation, the end product thereof was delivered to Captain Arthur C. Dixon, Chief of the Toxicology Section of the Laboratory.

Captain Dixon holds a Bachelor of Science degree, was engaged as a biochemist in a clinical laboratory for three and one-half years prior to his entry upon active duty, and has served seventeen months in the Army as a toxicologist. Testifying by deposition, Dixon stated he identified the residue delivered to him by Laffan as morphine. This identification was made by performing three color reaction tests described as the Marquis, Frohde, and Mecke tests, respectively, in which characteristic color reactions for specific alkaloids are obtained. The color reactions resulting from the residue obtained by Laffan were checked against the reactions of a standard known sample of morphine, thus providing a check upon the accuracy of the tests.

He further described morphine as a habit-forming drug, derived from opium. This substance is not manufactured within the body by any chemical reaction. It enters the body in only three ways: by eating, smoking, or injection.

At the trial the defense did not object to the receipt of this evidence.

The accused testified in his own behalf. He denied the use of narcotics in any form and displayed his arms to the court for the purpose of showing the absence of tell-tale needle marks. Questioned concerning the presence of morphine in his urine, he declared that he was unable to explain it.

Upon appeal the defense contends that the scientific reliability of the three color tests is questionable, and cannot therefore sustain a conviction. The defense attacks the admissibility of Captain Dixon's opinion that morphine was found in the accused's system; and secondly, assuming such testimony to be admissible, maintains that it cannot support the conviction in this case.

The determination of the identity of narcotics certainly is not generally within the knowledge of men of common education and experience. Consequently, this question very properly is the subject of expert testimony. (Manual for Courts-Martial, United States, 1951, paragraph 138e.) Captain Dixon's qualifications in this field were established by competent testimony and he was permitted to express his opinion upon the subject within the scope of his special qualifications without any objection by the accused. Ordinarily this would resolve any question of the admissibility of his testimony. United States v. Hagelberger, 3 USCMA 259, 12 CMR 15. However, the defense argues that the lack of unanimity among scientists on the subject of color reaction and the complete unreliability of the tests in that field destroy their usefulness as evidence.

In Frye v. United States, 293 Fed 1013, the Court of Appeals for the District of Columbia established the test of admissibility of expert testimony based on scientific tests. It declared:

". . . Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

The tests employed by the toxicologist in the case at bar have been in use more than fifty years, and their characteristics have been described by most of the scientific authors on this subject. See Rhodes, Forensic Chemistry (1940) page 185.[1] In his excellent work en-

---

[1] Color reaction tests for the identification of narcotics are also discussed by the following authorities:

Remington, Practice of Pharmacy, 7th ed, 1926.

Taylor, Vol. II, Principles and Practice of Medical Jurisprudence, 10th ed, 1948.

Lucas, Forensic Chemistry and Scientific Criminal Investigation, 4th ed, 1945.

titled "Poisons—Their Isolation and Identification," 3d ed, 1951, Frank Bamford has set out in detail the color reaction of various poisons, including morphine, to the Marquis, Mecke, Frohde, and Oliver tests. Since they show with particularity the characteristic color reactions of numerous compounds, we quote his description thereof in full:

## "GROUP II

"Group Reagent: Marquis

"This group contains alkaloids which give little or no colour with sulphuric acid alone, but give colours with the Marquis reagent:—

"Violet colours (various shades from bluish to reddish) are given by *morphine, apomorphine, heroin, dilaudid, codeine, dionine, eucodal, dicodide*.

"Cherry-red to reddish violet: *lobeline*.

"These alkaloids are sub-divided into Groups IIa and IIb according to their behavior in Oliver's test (*vide infra*).

"Group IIc consists of alkaloids which give colours with the Marquis reagent not closely resembling that given by morphine.

"Violet with tinges of green: *pseudo-morphine*.

"Yellowish, becoming pale redviolet (not sensitive): *papaverine*.

"Light brown, becoming darker: *ephedrine*.

"If a strong violet colour is produced, *Oliver's test* should be applied. To a faintly acid solution of the alkaloid, a drop of hydrogen peroxide is added and a drop of dilute copper sulphate solution; the liquid is then made alkaline with ammonia.

"Red to brown colours are produced with: *morphine, apomorphine, heroin* and *dilaudid* (Group IIa). No colour is obtained with: *codeine,*

*dionine, dicodide, eucodal* or *lobeline* (Group IIb).

"*Group IIa*

Colours with Oliver's reagents:—

Morphine } red, quickly fading
Apomorphine } to brown.

Dilaudid: yellow to brown
Heroin: bright red which persists for about half an hour.

• • • • •

"Mecke's Reagent

"This reagent yields colours which serve to distinguish between the alkaloids in Groups IIa and IIb.

"*Group IIa*

"*Morphine:* olive-green, changing to bluish violet and then again to olive-green with red edges.

"*Apomorphine:* bluish violet, changing to dark green with red edges.

"*Dilaudid:* yellow, changing to olive-green and finally to dull bluish violet.

"*Heroin:* bright pure blue; a green rim slowly develops and finally the whole is olive-green.

"*Group IIb*

"This reagent distinguishes between codeine and dionine, and dicodide and eucodal.

"*Codeine:* greenish blue, changing to bright pale blue and finally to bright green.

"*Dionine:* green, changing to olive-green with blue edges and the whole becomes olive-green.

"*Dicodide:* bright yellow, changing to grass-green, then bluish green.

"*Eucodal:* yellow, changing slowly to orange-green at the edges.

"*Lobeline:* faint, dirty grey, almost negative.

• • • • •

Simmons and Gentzkow, Laboratory Methods of the United States Army, 5th ed, 1944.
Witthaus and Becker, Vol. IV Medical Jurisprudence, 2d ed, 1911.
Rhodes, Forensic Chemistry, 1940.
Scott, Vol. II Standard Methods of Chemical Analysis, 5th ed, 1939.
United Nations Bulletin on Narcotics, Vol. 5, No. 2, April–June 1953.
Block, Paper Chromatography, Academic Press, Inc., N. Y., 1952.

"Frohde's Reagent

"*Morphine:* red-violet changing to light green.

"*Apomorphine:* immediately green, changing to blue.

"*Dilaudid:* pale mauve, fading to colourless.

"*Heroin:* like morphine.

"*Codeine:* yellow, turning green and finally blue.

"*Dionine:* yellow, turning green and finally blue.

"*Dicodide:* no colour.

"*Eucodal:* no colour.

"*Lobeline:* practically negative."

The defense relies upon many of these authorities in support of its contention that the color reaction tests performed by Captain Dixon in this case are unreliable. We quote from the three principal authors cited in the defense brief:

"Since a number of putrefactive bases are known to give reactions similar to those of certain alkaloids—of which morphine is one—it must be emphasized that reliance must never be placed upon a single test . . ." [Taylor, Vol. II Principles and Practice of Medical Jurisprudence, 10th ed, 1948, page 733.]

"The most satisfactory test for an alkaloid would be the preparation, purification and subsequent identification of a definite derivative or series of derivatives, as is done in the case of new organic compounds, but unfortunately the amount of material available is never sufficient for this and the chemist therefore, is forced to apply chemical color tests, though they are less satisfactory and sometimes may even be misleading if the alkaloid is not pure. Reliance, however, should never be placed upon the result of one test, but several confirmatory tests should be made, and the reaction obtained should always be compared with that produced by testing similarly a known pure specimen of the suspected alkaloid." [Lucas, Forensic Chemistry and Scientific Criminal Investigation, 4th ed, 1945, page 274.]

"Preliminary tests for alkaloids are of two sorts, precipitation reactions and color reactions. Although a large literature on the subject exists, most of the tests, particularly the color reactions, are of limited value. In putrefied material various amines, ptomaines or psuedo-alkaloids may be found. They may give some but not all of the reactions of a particular alkaloid. Therefore, a considerable number of tests must be applied before any alkaloid can be confirmed conclusively. Some specific property, such as the melting point, should be determined if at all possible." [Simmons and Gentzkow, Laboratory Methods of the United States Army, 5th ed, 1944.]

Summarized, these authorities enjoin upon qualified individuals conducting such tests a high degree of caution, and they point out that impurities sometimes will cause reactions tending falsely to indicate the presence of a particular alkaloid. Because of these limitations, each of the sources relied upon by the defense requires the use of several tests before a final conclusion can be expressed.

It is clear from the testimony of Captain Dixon that three distinct tests were conducted, and the results in each instance further verified by similar tests upon a standard known sample of morphine. Moreover, there was not even a suggestion of the presence of putrefied material or other impurities raised by the record of trial. Thus, it is clear according to the authorities relied upon by both the Government and the accused that the validity of the tests forming the basis of the expert's opinion in this instance are sufficiently well established to merit general acceptance in the particular field. Accordingly, this expression was properly received in evidence. Frye v. United States, *supra;* People v. Bobczyk, 343 Ill App 504, 99 NE (2) 567; McKay v. State, 155 Tex Crim 416, 235 SW (2) 173.

Relying upon United States v. Ellibee, 13 CMR 416, the accused finally contends that the opinion of Captain Dixon, standing alone, is insufficient to support a conviction. In that case, which

also involved the wrongful use of morphine, the evidence produced by the prosecution was substantially the same as that presented to the court-martial in the case at bar. However, in addition to denying the use of narcotics, the accused presented the testimony of a medical officer who observed the accused at the time he was required to supply law enforcement agents with a specimen of urine. The medical officer asserted that the accused was not then under the influence of narcotics and showed no evidence of having used them. Character evidence relating to the accused's reputation was also before the court. Evaluating this evidence, the board of review concluded that a reasonable doubt existed and therefore it disapproved the findings. Since the board was authorized to weigh the credibility of the expert witness in the same way that it would test the credibility of any other witness, the validity of its conclusion is beyond dispute. State v. Supers, 77 RI 251, 75 A2d 27. After disposing of the case in this manner, it then proceeded to review the authorities relied upon by the accused in this case. In an expression of opinion, which could only be supererogation, the board of review declared that color reaction tests have not received such standing and scientific recognition among authorities in the field of chemistry that they can be made the sole basis upon which to predicate a conviction.

The authorities relied upon by the board of review sufficiently indicate the scientific recognition of the tests in question. This would permit an opinion based upon them to be considered by a court-martial. Frye v. United States, *supra*. But, the question of sufficiency of the evidence rests upon other considerations. The touchstone of the problem is aptly described by the California Court in People v. Lloyd, — Cal App —, 220 P2d 10, in the following language:

"Appellant complains that the critical area of the evidence consists of expert analyses of blood and metals and that there was room for reasonable doubt in the minds of a reasonable jury. Such crimes as murder for money are done in solitude and often in darkness. For that reason the state finds it unavoidable to resort to the microscope, to chemistry and to fingerprints to find its way to the identity and the heart of a criminal. Such methods and facilities are not arbitrary but are customary. The weight to be given the testimony of such experts depends upon the reasons they assert . . . . The reasons they give and the opinions they assert are expressed in intelligible and simple language. But, however wise and learned they appear, a conviction cannot be based upon their testimony unless the jury are convinced of their correctness and their credibility . . . . Where on appeal the unreasonableness of a verdict is the basis upon which a reversal is demanded *the criterion by which the verdict under consideration is to be measured is whether a jury of reasonable men could have derived such a verdict, assuming the existence of every fact which could reasonably have been deduced under correct instructions.*"

In this case a qualified expert determined from a series of recognized tests that morphine was present in the accused's system. This substance is not generated in the human body by either its own tissues or by any food product. Its presence is incontestable proof of administration, by eating, smoking, or injection. Although its use, when properly prescribed by a physician, or when consumed by accident or mistake, is clearly innocent, the Government is not required to negative the existence of these exceptions in such cases. Such explanation must come from evidence produced by the accused. United States v. Gohagen, 2 USCMA 175, 7 CMR 51; Manual for Courts-Martial, United States, 1951, paragraph 213a. Under the circumstances, the accused's denial of wrongful use of morphine raised a question of fact which the court resolved adversely to him, upon evidence sufficient to warrant such a conclusion.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.