UNITED STATES, Appellee

v

RUDOLPH A. JOHNSON, Specialist Third Class, U. S. Army, Appellant

9 USCMA 591, 26 CMR 371

No. 10,231

Decided September 19, 1958

*First Lieutenant Gerald G. Barton* argued the cause for Appellant, Accused. With him on the brief were *Colonel Edward M. O'Connell, First Lieutenant Stephen D. Potts,* and *First Lieutenant Jerome H. Gerber.*

*First Lieutenant Jon R. Waltz* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel John G. Lee, Major Thomas J. Nichols,* and *First Lieutenant William K. Davenport.*

## Opinion of the Court

HOMER FERGUSON, Judge:

A general court-martial convened at Fort Dix, New Jersey, convicted the accused of three specifications alleging the wrongful taking, opening, and stealing of mail, respectively, in violation of Article 134 of the Uniform Code of Military Justice, 10 USC § 934. We granted review to consider a number of issues which have been raised.

The major claim of error relates to the law officer's failure to instruct the court-martial that it must disregard the accused's confession if ▮▮▮▮▮▮ it determined that it was involuntarily obtained. The omission was clearly erroneous and comes within the rule announced in United States v Jones, 7 USCMA 623, 23 CMR 87. Whether the error was prejudicial, however, necessarily depends upon an issue of voluntariness being raised. The relevant factors upon which our decision must turn are

592

these. During the latter part of July 1956, several complaints were received from members of Company M, Second Training Regiment, that mail was being improperly delivered. There were also complaints that money being sent through the mails was not being received. Agent Kuchinski of the Criminal Investigation Detachment was notified and he proceeded to select a designated trainee to whom so-called test letters would be addressed and sent. On September 4, 1956, four of these letters were prepared by postal inspectors of the United States Post Office Department. Each letter contained United States currency and each bill was marked by identifying tick marks. Fluorescent powder was also placed on the bills. A list of the contents of these letters was made including a record of the serial number of each bill. The letters were then given to the Superintendent of the Post Office Branch, Fort Dix, for delivery to the selected trainee, and were placed in a bundle of mail directed to the regiment. At mail call only two of the four test letters addressed to the designated trainee were delivered.

Later that day the accused was apprehended near his off-post residence by the postal inspectors. The marked and chemically treated bills were found in his possession. A subsequent search of his car by the inspectors revealed nine unopened letters. The accused was warned of his rights under the Fifth Amendment by the inspectors and of his rights pursuant to Article 31 of the Code, supra, 10 USC § 831, by Agent Kuchinski. At that time he stated that he had received the marked bills in change at the post exchange and that his possession of the letters was inadvertent.

On the following day Agent Kuchinski interrogated the accused after again advising him of his rights under Article 31 but apparently the accused declined to make a statement at that time. The next day he was again warned and questioned, at which time he orally confessed to the theft of "a letter." Later the same day the accused dictated a more complete formal statement in which criminality was admitted. This statement was signed two days later.

The prosecution offered the statement in evidence and attempted to prove that the accused had been neither threatened nor coerced and that the statement represented his voluntary act. Defense counsel objected to the statement's admission on the ground that it had been involuntarily obtained. The accused took the stand for the purpose of challenging the statement's admissibility. He testified that Agent Kuchinski had told him he "would be turned over to the federal authorities" if he refused to cooperate and that "it would be better" for him to be tried by the military than by the "Feds." In addition, he stated that he had been "pressed hard" because he wasn't allowed to see his wife or to visit his home off-post.

On cross-examination he acknowledged that he had been unable to go home because he had been restricted to the company area. He readily admitted that he had not been mistreated and that he had been read Article 31 "3 or 4 times." He replied in the affirmative when asked if he feared being turned over to the "Feds" although he was unable to say why. In rebuttal, Agent Kuchinski denied he had discussed with the accused the possibility of prosecution by Federal civil authorities. The law officer admitted the statement in evidence over the defense objection that the accused had been subjected to unauthorized threats and promises of leniency for cooperation. We first consider whether the accused's testimony that "I would be turned over to the federal authorities if I didn't cooperate with him," and that, "it would be better if I was tried by a military— military authorities, than it would if they were to turn me over to the 'Feds'," is of such inducement to raise an issue of voluntariness.

It is clear from the evidence that the accused's acts were equally punishable as violations of the United States Code and the Uniform Code of Military

Justice.[1] It is also clear that his detection and apprehension resulted from the combined efforts of the postal inspectors and the Criminal Investigation Detachment.[2] For purposes of this discussion, we must assume that the testimony of the accused represented in fact the words used by Agent Kuchinski. Does such a statement in and of itself constitute an unlawful inducement that the triers of fact could find the confession involuntary? Based upon the rule that any credible evidence is sufficient to raise an issue of involuntariness so as to require instructions thereon, we think the assertions of the accused meet that requirement. The triers of fact could have found that the operative reason behind the confession of the accused was the direct result of the unlawful inducement pressed upon him by law enforcement agents. "The admissibility of a confession of the accused must be established by an affirmative showing that it was voluntary, unless the defense *expressly consents* to the omission of such a showing, but an admission of the accused may be introduced without such preliminary proof if there is *no indication* that it was involuntary." (Emphasis supplied.) Paragraph 140*a*, Manual for Courts-Martial, United States, 1951. We cannot say as a matter of law that the evidence presented here indicated the confession was voluntary. For these reasons we hold that the issue of voluntariness was raised, and as a result the accused was prejudiced by the erroneous instructions.

Since our conclusion relative to this issue may require a rehearing, there is no need for us now to discuss the remaining issues which may not reoccur upon that occasion.

The decision of the board of review is reversed. The record is returned to The Judge Advocate General of the Army for further action in accordance with this opinion. A rehearing may be ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

The majority finds an issue of the involuntariness of accused's pretrial statement because the triers of fact could have concluded it was the result of an unlawful inducement pressed upon him by law enforcement agencies. As I interpret the Court's opinion, the inducement finds its root in alleged statements by an investigator that unless the accused cooperated with him, the prosecution would be turned over to civilian authorities and it would be better for him to be tried by the military. The question, therefore, is simply whether those statements could be found to have constituted either a threat or an inducement which so operated on the mind of the accused as to deprive him of that mental freedom of choice inherent in a voluntary confession. In my judgment, they could not and I will analyze them in the order stated.

In considering the first assertion that the accused would be turned over to Federal civilian authorities unless he cooperated with the military service, I fail to understand how or in what way that was an illegal or unlawful threat. This is not a case of obtaining a statement by threats of prosecution, for the accused had every reason to know he would be tried for his offenses. Both Federal and military authorities were involved in investigating and arresting him and either could have proceeded against him for his criminal conduct. It was not suggested that he would not

---

[1] The following applicable offenses against the mails are specifically denounced under the United States Code:

18 USC § 1701 — obstruction of mails

18 USC § 1702 — obstruction of correspondence

18 USC § 1703 — delay or destruction of mails

18 USC § 1708 — theft of mail matter

18 USC § 1709 — theft of mail matter by employee

18 USC § 1717 — opening letters

[2] Specifically attributable to the postal inspectors was setting the trap, apprehending the accused, and conducting the first interrogation.

be prosecuted if he confessed or that he would be extended leniency by either department of Government. Moreover, he knew his offenses were serious and, regardless of which agency tried him, if found guilty, he would receive a severe sentence. Much can be said in favor of the fundamental fairness of either or both systems and many well-informed judges believe the civilian courts afford an accused more protection than do courts-martial—a concept I do not share—but merely suggesting that one or the other might represent the Government is no more than a fair statement of the possibilities that existed in this instance.

Moving on to consider the effect on the accused of that statement, he makes no showing that he was frightened to such an extent he confessed to an offense he did not commit. Of course, he made a statement that he feared being turned over to the civilian officials but when interrogated as to the basis for his fears he conceded he did not know. Neither do I except the fear that naturally arises from the prosecution for the commission of a serious offense. Fear springing from that source is not coercion within the meaning of the law.

The second statement that accused would be benefited if prosecuted by military authorities was nothing more than an expression of a personal opinion of the interrogator. But it was not improper or illegal and it could not have deprived the accused of his freedom of choice. He well understood he was not required to make any statement and if he relied on the opinion, he knew he would be tried and the statement would be used against him. I, therefore, do not find that he was induced to speak involuntarily. In cases of this nature we must set some standard of reasonableness, otherwise investigators will be denied the right to converse with persons accused of a crime. The theory behind the rejection of involuntary confessions is that they are likely to be untrustworthy because they are the product of a mind which is harassed by unlawful influences. However, the pangs of the conscience and the fears incident to prosecution do not fall in

that category. Moreover, much of accused's statement was exculpatory and repeated by him at the trial. That hardly suggests that the original product was wrung from him by unlawful acts.

The remaining claim of involuntariness stems from accused's allegations that he was "pressed hard" by not being allowed to see his wife or visit his off-post home. Under the circumstances, detention and restriction of the accused to his company area was ordinary procedure and accused knew the reasons for his confinement within bounds. Administrative restriction to assure a suspect's "continued presence pending investigation" is specifically authorized by both the Code and the Manual. Article 9, Uniform Code of Military Justice, 10 USC § 809; paragraph 20b, Manual for Courts-Martial United States, 1951. In addition, being "pressed hard" is a vague and nebulous phrase, and accused offers little to support or clarify his statement. It was never asserted that the motivation for his pretrial statement was the possibility of permission to leave the post or see his wife, nor is it contended that such an inducement was ever offered. No doubt the accused labored under considerable fear and strain during this period for much incriminating evidence had not been uncovered. Faced with the prospect that additional information would be obtained which would multiply his offenses, fears and mental torture would seem normal in all save perhaps the most hardened criminals. Such mental reactions, springing as they do from a personal consciousness of guilt, cannot be used as the basis for a showing of involuntariness. United States v Hagelberger, 3 USCMA 259, 12 CMR 15; United States v Colbert, 2 USCMA 3, 6 CMR 3.

There is yet another reason why this case should not be reversed. Assuming, arguendo, that accused's testimony raised an issue of voluntariness, I would apply the doctrine of compelling evidence. The statement was not a confession and it added little to the quality or quantity of the evidence for the prosecution. On even a hasty perusal of the record, one is struck with

the weight and credibility of the evidence supporting the Government's case. During the evening of September 4, 1956, shortly after his apprehension, accused was found to be in possession of marked and recorded bills which had been dusted with powder and planted in the mails. Though his fingers, under the fluorescent light, gave mute testimony to the illegal acquisition of the bills, accused's sole unsupported explanation was that the money had been received in change at the post exchange.

Shortly thereafter, nine unopened letters addressed to men in his company were found in a magazine on the front seat of his car. The explanation in this instance was that the addressees had not been present for mail call on September 4, and the mail had subsequently been forgotten. Four of the addressees testified at trial that they had been present when mail was distributed that day. Another unsealed letter found in accused's jacket pocket was similarly explained, and the addressee testified that he, too, had been present for mail call.

A search of the trunk of accused's car later in the evening of September 4, 1956, revealed twenty-two letters postmarked in February and March 1956. In his written admission, accused stated that such letters had been the subject of a previous investigation involving complaints of money missing from letters, that they had been placed in the trunk during preparation for an inspection and subsequently forgotten.

On September 5, 1956, a search of accused's apartment was conducted with his permission. Investigators found a bundle of letters, wrapped with the type of cord used at the post office and placed in a drawer behind some clothing. Accused sought to explain this in his statement by saying that these letters had been taken home for readdressing at night some months previously, that he did not know how the letters had gotten in that particular location, but they could have been carried there by the children.

In the light of the foregoing evidence, I have no difficulty in concluding that accused was not prejudiced by the erroneous instruction, even if it is assumed that the voluntariness of his statement was placed in issue. Apart from any damaging testimony in his pretrial statement, a chain of circumstances has been forged which unerringly compels the objective observer to a finding of guilt.

I find no merit in the other assigned errors, and would therefore affirm the decision of the board of review.