UNITED STATES, Appellee

v.

ALFRED L. PAYNE, Sergeant, U. S. Army, Appellant

6 USCMA 225, 19 CMR 351

No. 6349

Decided August 5, 1955

*First Lieutenant Albert T. Ussery* argued the cause for Appellant, Accused. With him on the brief were *Major Edwin Doran* and *First Lieutenant Joseph B. Axelman.*

*Lieutenant Colonel Andrew D. Kane* argued the cause for Appellee, United States.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused stands convicted by a general court-martial of the wrongful use of a habit-forming drug. He was sentenced to a dishonorable discharge, three years' confinement, and total forfeitures. The findings and sentence were affirmed by the convening authority and a board of review in the office of The Judge Advocate General of the Army. We granted a petition for review to determine the following issues which accused contends require a reversal of his conviction:

(1) Whether an incriminatory statement made by him was obtained by officers of the Government in violation of Article 31, Uniform Code of Military Justice.

(2) Whether the evidence is sufficient to support the findings of guilt.

In approaching the specific questions in this case, we first mention the facts which are of general interest to both issues. On information furnished by a confidential informant, the accused was apprehended as a suspected user of narcotics. He was taken into custody in his company area, and there was nothing unusual in his behavior at that time. Immediately after he was apprehended, his wall locker and his personal belongings were searched. There was no paraphernalia for administering narcotics found among his possessions, and an examination of his uniforms resulted in a failure to reveal any indications of the presence of narcotics. Notwithstanding the negative results of the search, the accused was taken to a dispensary, where he voluntarily submitted a sample of his urine. This specimen was analyzed at the Medical General Laboratory in Tokyo, and the official report rendered on the analysis showed a negative result. However, the contents of the report will be further scrutinized when we discuss the second issue.

A physical examination of the accused was made by a medical examiner, and he reported the absence of needle marks. In addition, he concluded that the accused's pupillary responses and his mental status did not indicate the presence of narcotics in his system. But he testified that the physical indicia for which he examined the accused would "wear off" after four hours and that the only test which would be reliable after 24 hours would be a urinalysis.

I

The first issue causes the author little difficulty. I do not necessarily oppose the reservations expressed by my associates, but they are based on sup-

**227**

positious cases. A different state of facts might force a different conclusion, but this is the evidence which furnishes the framework for my views. Approximately one week after the accused was taken into custody, he was interviewed by two investigators from the Criminal Investigation Detachment. He was informed fully of his right not to incriminate himself as required by Article 31 of the Uniform Code, 50 USC § 602. The interview lasted for approximately three hours, when it became necessary for one of the investigators to leave. During the interview, the accused had exercised his privilege not to answer any questions which tended to incriminate himself. However, after the departure of the one investigator, the remaining member worked a ruse by propounding this question:

"Man to man, just between you and I, when was the last time you used narcotics?"

The accused looked around, laughed, seized the bait, and stated:

"I took it the morning before you picked me up the next afternoon and took me to the dispensary."

Not being content with his first disclosure, the accused volunteered the following helpful information to the investigator. This is the agent speaking and he is quoting the accused:

". . . that inasmuch as he [the accused] and I were the only ones in the room, I didn't have any witnesses, his words were as good as mine."

Counsel for the accused contend the statements were inadmissible for two reasons: first, because of ▆▆▆▆ ▆ failure to warn and, second, because of inducement, coercion, and compulsion on the part of the investigator. The argument on the first reason runs substantially as follows: The accused had been advised previously of all of his rights under Article 31 of the Code. He had steadfastly refused to incriminate himself, but the departure of one agent led him to believe that the interrogation had terminated. Thereafter, the effect of the warning was nullified by the ingratiating approach of the remaining investigating officer. In effect, the

**228**

"man to man" approach and the changed conditions caused the accused to be misled into believing that his reply would not be used against him at a subsequent trial. The argument is not overly-impressive, for the accused was well advised that he need not answer any question and that, if he did, his answer could be used against him. No command status was involved, the parties were dealing at arm's length, and no subsequent promise, express or implied, that any disclosure would be kept confidential, was made. The most that can be said in accused's support is that the investigator may have used a stock "trick of the trade" to catch him off-guard. But intentional misrepresentations of fact, such as a promise of secrecy, which are not likely to elicit an untrue statement, do not render a confession inadmissible. Fincher v. State, 211 Ala 388, 100 So 657 (1924); Flowers v. State, 152 Fla 649, 12 So 2d 772 (1943); Wigmore, Evidence, 3d ed, § 841. That the accused was not an uninformed victim may be gathered from his repeated exercise of his privilege to remain silent, his statement that there were no witnesses to his admissions, and his stated belief that his word was as good as the word of the investigator. The latter smacks of being a challenge that he was not concerned about his statement because at trial it would be one man's word against another, and his word would carry just as much weight as that of the investigator. That mistake on the part of a defendant is not without precedent in criminal litigation.

Much of what has been said applies with equal force to the contention that the accused was coerced, induced, or compelled to answer. Implicit in each of those external pressures must be found a force which has a tendency to deny the accused his right of free choice and cause him to admit an offense against his will. I find no pressure of that sort in this record. Assuming, without deciding that the agent intentionally indulged in a stratagem to obtain an answer, he neither compelled nor coerced nor illegally induced the accused to respond. I believe that some ingenuity is permissible in dealing with

suspects, and we have previously stated that a ruse, while frequently deprecated by the courts, is nonetheless permitted. United States v. Gibson, 3 USCMA 746, 14 CMR 164. The method here used is more properly catalogued as a clever tactic than as a fraudulent technique.

## II

To dispose properly of the second issue on the sufficiency of the evidence, it becomes necessary to decide whether there is sufficient evidence aliunde the pretrial confession of the accused to show the probability that he used morphine on or about the date alleged. If there is sufficient evidence in the record for that purpose, it, together with the confession of the accused, is sufficient to support the finding of guilt. The contention that there is insufficient evidence to establish the corpus delicti is made tenable by the following facts and circumstances. The sample of urine was examined at the Medical General Laboratory, and the official report submitted by that Laboratory contained an entry that the analysis disclosed no opium alkaloid present in the sample. Based solely on that report, counsel for the accused contend there is no evidence, aside from the accused's confession, that he had used morphine. We disagree with counsel because we believe the official report is explained by other evidence which shows the probability of the presence of morphine. In United States v. Isenberg, 2 USCMA 349, 8 CMR 149, we held the burden was on the Government to establish the probability that the crime charged had been committed. We stated further that to carry out that burden, it was incumbent upon the prosecution to establish the probability of the existence of each element, save the identity of the accused. In order to comply with that principle, this record need only establish the probability that morphine was present in the body of this accused, as that is the only element which can be considered as not well established.

In explaining his reasons for submitting a negative report, the chemist, and toxicologist who prepared it, testified the Medical General Laboratory had a working rule that an official report showing the presence of morphine would not be submitted unless the sample furnished to it satisfied six criteria. These were as follows: (1) It must appear on the chromatograph; (2) be in the proper extract; (3) have a position (Rf) commensurate with a known standard; (4) react to the Marquis color test; (5) react to the Frohde color test; and (6) react to the Meckes color test. To be perfectly sure and to maintain the highest degree of accuracy possible, there was no variation permitted from the conservative policy that in the event the sample failed to meet any one of those six prescribed criteria, the official report was forwarded showing a negative result.

We commend the policy adopted by the Laboratory, but certainty is not needed for the purpose of meeting the corpus delicti requirement, as probability is all that is required. In this particular instance, the sample was positive when subjected to the first three tests and the Marquis and Frohde color tests. It, however, failed to satisfy the Meckes color test although there was a faint showing that morphine was present. It was the failure to meet this one color reaction test which caused the Laboratory to submit the negative report. The sample met the five other criteria, and there was testimony that of the three color reaction tests, the Meckes test is the least sensitive. This, no doubt, accounts for a positive reaction in the more responsive color tests and the failure to obtain affirmative results with the less sensitive. It necessarily seems to follow that morphine was present in the sample, but the amount had decreased to such a point at the time the sample was obtained that the Meckes test was not readily affected.

While the toxicologist hedged between the possible and probable areas as to the presence of the drug, when his testimony is considered from its four corners, it becomes clear the five positive tests establish that morphine probably was present in the sample. In addition to what we have previously related, the

toxicologist testified that not all authorities require the same rigid standards—standards requiring a sample to meet all six criteria—but that he would not certify positively to the presence of morphine on any lesser standard. He, however, noted that the sample analyzed by the laboratory reacted in a positive manner to both the Frohde and Marquis color tests and that, to his knowledge, there was no substance other than morphine which would do so. We, therefore, conclude the Government produced sufficient evidence to establish the corpus delicti of the crime and that the confession is admissible and corroborated.

In addition to testimony showing that morphine was present in the body of the accused, the medical ▮ testimony establishes that it could get there only by way of injection, smoking, eating, or drinking. The accused made no showing that his use was authorized by law or that the drug was present in his system without his knowledge. There is, therefore, evidence which would permit the court-martial to find beyond a reasonable doubt that the accused wrongfully and knowingly used morphine.

The decision of the board of review is affirmed.

QUINN, Chief Judge (concurring in the result):

I concur in the result.

Like Judge Brosman I doubt that "a promise of secrecy," particularly if made by a commanding officer, can be regarded under all circumstances as a mere "trick of the trade." However, we need not decide the question in this case. It is unmistakably clear that the "man to man" remark by the Criminal Investigation Division agent did not induce the accused to make the incriminating statement.

As far as the sufficiency of the evidence is concerned, the general reliability of the color tests used to determine the presence of morphine was recognized by us in United States v. Ford, 4 USCMA 611, 16 CMR 185. The results of the individual tests are sufficient to corroborate the accused's confession and establish his guilt beyond a reasonable doubt. See my concurring opinion in United States v. Villasenor, 6 USCMA 3, 19 CMR 129.

BROSMAN, Judge (concurring in the result):

This memorandum is concerned solely with the first specified issue—and I am sure that as to it we have come to the proper result. However, I am a shade doubtful about the route followed in the principal opinion to the correct conclusion it reaches.

## II

At the end of the interrogation, which was preceded by an appropriate warning, one of the investigators—in the absence of his associate—inquired of the accused, "Man to man, *just between you and I,* when was the last time you used narcotics?" (Emphasis supplied.) In the face of this language, Judge Latimer is sure that "no subsequent promise [that is, one subsequent to the Article 31 warning], express or implied, that any disclosure would be kept confidential, was made." I am not so certain of this as he—for it is distinctly arguable that an implied promise to hold an answer "just between you and I" is tantamount to an assurance that the reply will be regarded as confidential, and hence will *not* be used against the suspect in a trial by court-martial. It is thus possible that the interrogator's final inquiry may have included a "promise of secrecy."

But we are told by my brother that "intentional misrepresentations of fact, such as a promise of secrecy, which are not likely to elicit an untrue statement, do not render a confession inadmissible." If all parts of this observation are properly interpreted and given full weight, it is probably accurate enough. Certainly within some contexts it is. However, I am inclined to doubt that an incriminating answer is admissible in evidence if it is supplied by a suspect following an outright promise that it will be held by the investigator in confidence, and therefore not used in a later trial by court-martial—this although the interrogation

opened with an understood reading of Article 31.

### III

However, this may be, I am not out of accord with the majority's determination of the point—this for two interdependent reasons. In the first place, although it may be argued that the agent's inquiry included a promise of confidentiality, I do not at all believe that it was meant to do so. Second, and much more important, I am quite certain that the accused here did not interpret it in this manner. This is made abundantly clear by his later uncontradicted statement to the effect that "inasmuch as he and I [the agent] were the only ones in the room, I didn't have any witnesses, his words were as good as mine." In order that a confession be rejected by reason of unlawful inducement, not only must the inducement be unlawful, but it must also have been made, and it must have been relied on. Here it seems certain that it was not accepted by the accused.