UNITED STATES, Appellee

v

RUDOLPH WAGNER, Staff Sergeant,
U. S. Army, Appellant

18 USCMA 216, 39 CMR 216

*Captain Thomas R. Maher* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Lieutenant Colonel Martin S. Drucker, Captain Stephen Arinson, Captain James E. Stevens,* and *Captain Anthony F. Cilluffo.*

*Captain Harvey L. Anderson* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major Edwin P. Wasinger.*

## Opinion of the Court

QUINN, Chief Judge:

The accused, a soldier with almost sixteen years of honorable and specially commended service, became involved in a confrontation between a group of Military Policemen and a group of servicemen. As a result of his conduct, he was charged with a number of offenses in violation of the Uniform Code of Military Justice and was brought to trial before a general court-martial. Some charges were dismissed on defense motion, and the court-martial found the accused not guilty of others, but he was convicted of causing and participating in a riot and of two separate assaults upon a Military Policeman in the execution of his office, in violation of Articles 116 and 134, Code, supra, 10 USC §§ 916 and 934, respectively. He was sentenced to reduction to private and confinement at hard labor for one year.[1] We granted review to consider several assignments of error.

First, the accused contends that a statement he made at the scene of the riot was obtained in violation of his right to remain silent, as expounded in Miranda v Arizona, 384 US 436, 16 L. Ed 2d 694, 86 S Ct 1602 (1966), and United States v Tempia, 16 USCMA 629, 37 CMR 249. In the course of the confrontation, a group of soldiers, described as "very upset" and "getting fired up," refused repeated police requests to disperse. Several of the members of the group spat at the policemen; others vilified them with epithets; and still others shouted threats to kill or to " 'get' " the policemen. There is testimony that at various times the accused asserted he was " 'the man,' " and the members of the group were his " 'boys,' " who would do " 'what' " he told them. There is some dispute as to the immediate circumstances under which the statement in issue was made. Appellate defense counsel contend that what probably happened was that the accused was placed in apprehension and, as he was being assisted into a vehicle to be transported to the station house, he was asked a question by Agent Maurice C. Merritt, Criminal Investigations Detachment, to which he gave the allegedly incriminating answer. No objection was made at trial to the admission of the statement, but the accused not contends it was inadmissible because obtained during custodial interrogation, without preliminary advice as to his right to remain silent and right to counsel. Government

---

[1] The Secretary of the Army remitted the balance of the period of confinement, and accused has been restored to duty.

counsel maintain the question was probably asked "prior to the apprehension," but they concede the "exchange" might have occurred after apprehension was effected. The testimony as to the statement is as follows:

"Q Did Sergeant Wagner assist you or any of the other Military Policemen or anybody that evening in quelling any disturbance that was taking place there?

"A He told me that he could have stopped the whole thing but he refused to do so.

"Q What were his words? Can you be more particular? Did you make any requests of him?

"A I told him, 'You're a sergeant, and I'm ashamed of you, Sergeant. Why didn't you stop this?' And he says, 'I could have stopped this thing, but I'm not going to do it, and if you think this is a riot, wait until I get out of here.'"

The view we take of the matter makes it unnecessary to decide whether apprehension occurred before or after Agent Merritt asked his question. Article 31 of the Uniform Code prohibits the admission in evidence of any statement made by a suspect or accused in response to questioning about an offense, unless he was first informed of his right to remain silent. Agent Merritt testified that in trouble of the kind presented by the confrontation, the police usually try to get "the ringleaders out." He observed that two Military Police Sergeants, Simms and Bell, "had tried to isolate" the accused. He approached the trio, and told the accused to "'[t]ake it easy Mac.'" At that moment, an officer called him, so he left. When he finished talking to the officer, he suggested to another officer that the police "get the trouble makers out" and clear the area. The officer agreed, and Merritt told several Military Policemen to "get into action." He then "went over to where Sp4 Simms and Bell were talking to Sergeant Wagner and told them to take him to the MP station." Since Merritt was, in effect, directing the accused's arrest, he must have thought he had probable cause to believe the accused was involved in the riot. Under Article 31, therefore, he could not ask the accused any questions concerning the riot, without first advising him of his right to remain silent. United States v Gorko, 12 USCMA 624, 31 CMR 210; United States v Wilson, 2 USCMA 248, 8 CMR 48. As there is no evidence of such preliminary advice, the accused's statement was inadmissible in evidence against him. See United States v Lincoln, 17 USCMA 330, 38 CMR 128.

The erroneous admission in evidence of a pretrial statement obtained in violation of Article 31 has been held sufficient to justify reversal of a conviction, without attempting to calculate the probable impact upon the court members. United States v Wilson, supra, at page 255; United States v Williams, 8 USCMA 443, 24 CMR 253; cf. Chapman v California, 386 US 18, 17 L Ed 2d 705, 87 S Ct 824 (1967). However, where the accused is charged with other offenses, and the inadmissible statement is unrelated to these, findings of guilty unconnected with the statement, and otherwise unimpeachable, may properly be affirmed. United States v Sack, 18 USCMA 50, 39 CMR 50. In our opinion, the statement in issue falls into this category.

One of the charges on which the accused was arraigned was that, in violation of Article 134, he failed "to do his utmost to suppress a riot." The charge was dismissed by the law officer. Since the disputed statement is concerned with this offense, it would appear that dismissal of the charge ended the matter. However, appellate defense counsel contend that a reference to the statement in trial counsel's final argument presents a fair risk it influenced the court members in regard to the other offenses associated with the riot.

In initial argument, trial counsel reviewed the testimony as to the many statements the accused was heard to make in the course of the confronta-

218

tion, such as " 'I'm the man. These are my boys. They'll do what I tell them' "; he argued these statements demonstrated the accused was the "leader" of the "mob," and he, in fact, led it to create "fear and terror in the street." In the closing argument, trial counsel rejected a number of defense hypothecations, and concluded as follows:

"Gentlemen, the military police had a duty that evening, a very distasteful duty, one I am sure no one in this room would have been quick to assume. Gentlemen, they did their duty. They stood their ground that night in Friedberg when there was terror in the streets, and the prosecution is asking that you gentlemen do your duty here this morning and find the accused guilty as charged.

"Lest there be any doubt as to the accused's intentions that evening, recall the words of Mr. Merritt, who testified on the stand, who told us Sergeant Wagner said to him, 'If you think you've seen a riot here tonight, wait until I get out of this.' "

Neither by itself, nor in conjunction with the other evidence, does the statement constitute an ▮▮ admission that the accused caused or participated in the riot. It is substantially similar to the accused's trial testimony. He testified that some of the persons in the crowd confronting the police were "ballplayers" for whom he was "[i]ndirectly . . . responsible" because he was supervisor of all post athletic programs. He contended he spoke to Military Police Sergeant Robert M. Gorneau and told him that, if Gorneau could get the "attention of the crowd," the two of them might be able to "get the men to move" off the street and into the tavern from which they had come, but his offer was ignored. Later, after the Military Policemen had fired some shots into the air, he told a guard on the football team, who was standing near him, that " 'somebody has to stop it before it gets out of hand.' " Again, he went to Gorneau, but again was ignored. In essence,

the pretrial statement is a summary expression of these efforts; in other words, it deals with what the accused could have done to stop the riot, not with what he may have done to cause it. It further appears that the law officer specifically instructed the court members to disregard "all evidence bearing on" the dismissed specification. In the light of these circumstances, we perceive no reasonable risk that the court members were persuaded by trial counsel's argument to consider the pretrial statement in their deliberations as to the accused's guilt of the other offenses. Cf. United States v Sack, supra; United States v Beatty, 10 USCMA 311, 314, 27 CMR 385.

A second assignment of error alleges that trial counsel's cross-examination of three defense witnesses exceeded the bounds of propriety by attempting to insinuate that defense counsel had improperly coached the witnesses during a short recess. In an out-of-court hearing, trial counsel admitted he had no evidence of subornation of perjury or any other wrongdoing in the defense conference. The law officer admonished him to desist from further questioning in that area. Each witness testified that nothing was discussed with defense counsel which even hinted that the witness testified to anything but his honest recollection of the incidents in issue. All the witnesses denied that defense counsel suggested they lie or distort their testimony.

We need not consider the circumstances under, and the extent to, which counsel can question ▮▮ tion an adverse witness about the nature of discussions he has had with others, including opposing counsel, about the case. See Solar v United States, 94 A2d 34 (Mun Ct App DC) (1953); Annotation, 35 ALR2d 1045. For present purposes, we may assume that the implication of several of trial counsel's questions was unjustified. The record demonstrates, as defense counsel's brief admits, that the attempt to establish subornation was

**219**

"vain." We have an abiding conviction that trial counsel's efforts did not impress the court members and did not prejudice the accused's defense. Cf. United States v Bigelow, 11 USCMA 527, 29 CMR 343.

Turning to other conduct by trial counsel, the accused contends the overall effect was to deny █ the accused a fair trial. Certainly, there were acrimonious exchanges between counsel. Where such exchanges are extensive and uncontrolled by the law officer they may "establish a complete lack of judiciousness" in the proceedings, and introduce so many extraneous matters into the case as to deny the accused a fair trial on the merits. United States v Lewis, 16 USCMA 145, 147, 36 CMR 301. Such a situation did not obtain here. The law officer kept trial counsel within permissible bounds. As pointed out earlier, he cut short trial counsel's cross-examination as to the conference between defense counsel and defense witnesses when it became apparent trial counsel had no evidence of collusion. He also demonstrated an alertness to the potential harm inherent in personal clashes between counsel. At one point, he specifically informed counsel he would not tolerate further "bickering," and he admonished them to "control" themselves; he further warned that, if they continued to inject personal differences into the case, he would declare a mistrial to insure the accused had "his fair day in court."

Appellate defense counsel contend that, despite the law officer's continuous restraining influence, the hostility between counsel forced defense counsel to plead to the court members not to "pass . . . on to" the accused the "animosity" they may have had toward him. We do not read defense counsel's comments the way appellate defense counsel would have us read them. They impress us as a routine exhortation to the court members to consider the case on the evidence. In context, defense counsel's remarks were as follows:

"Gentlemen, when you prosecute a case and when you defend a case, it oftentimes becomes a frustrating and exasperating thing, and sometimes this even passes over onto the court. The court becomes somewhat frustrated. They become somewhat exasperated. There seem to be delays and recesses and out-of-court hearings, and it seems to take a lot of time to accomplish very little. Part of those delays were caused by myself. I just wanted to mention that this was not intentional on my part. This is part of the defense and how it has to be done. I may have antagonized some of you gentlemen, either by my actions or the way I examined the various witnesses. Again this was not intentional. I just wanted to mention that, if you have any animosity towards me, I am sure you will not pass it on to my client."

We are satisfied from our reading of the record that the accused received a fair trial, free from any error affecting a substantial right. Accordingly, the decision of the board of review is affirmed.

Judges FERGUSON and DARDEN concur.