UNITED STATES, Appellee,

v.

Donald L. HANNA, Airman Basic, U.S. Air Force, Appellant.

No. 31,434.
ACM 21868.

U. S. Court of Military Appeals.

2 Dec. 1976.

---

1. *United States v. Lacey*, 23 U.S.C.M.A. 334, 337, 49 C.M.R. 738, 741 (1975).

*Major Bruce R. Houston* argued the cause for Appellant, Accused. With him on the brief was *Colonel Jerry E. Conner.*

*Major John A. Cutts, III,* argued the cause for Appellee, United States. With him on the brief were *Colonel Julius C. Ullerich, Jr.,* and *Captain Frederick P. Waite.*

Opinion of the Court

COOK, Judge:

The question presented by this appeal is whether the accused was prejudiced, as to certain offenses of which he was convicted, by the failure of the trial judge "to instruct on the issue of the voluntariness" of oral pretrial statements by the accused to Office of Special Investigation agents, which were admitted into evidence without defense objection.

Among other offenses, the accused was charged with a number of acts of arson and two unlawful entries with the intent to commit arson at Andrews Air Force Base, Maryland, in violation of Articles 129 and 130, Uniform Code of Military Justice, 10 U.S.C. §§ 929 and 930, respectively. The charges were referred to a general court-martial for trial. At a preliminary Article 39(a) hearing by the trial judge, the accused pleaded guilty to the other offenses, but not guilty to the specifications concerned with arson. After the judge determined that the accused understood the meaning, effect, and consequences of a plea of guilty and accepted the plea, he inquired of counsel whether there were anticipated "evidentiary" issues. He was informed there would be "litigation" as to the admissibility of the pretrial statements. Evidence, including testimony by the accused, was received on this matter, and eventually, the judge overruled a defense objection to admission of the statements into evidence. The statements constitute the only material evidence that identifies the accused as the person who committed the offenses.

Before assembling the court with court members, the judge reconvened the Article 39(a) session the next morning. As what transpired is important to the appeal, we set out, in full, the material part of the proceedings:

TC: Your Honor, I'd like to inquire at this time as to whether or not the issue of voluntariness of the pretrial statement will be litigated to the jury, whether or not defense wishes to place this in issue before the jury. I need to know this so in directing my direct examination of witnesses I might proceed in a different vein.

MJ: Defense Counsel?

DC: Your Honor, defense does not intend to raise the issue of voluntariness to the jury.

MJ: All right, if you had any problems with the witnesses like Keebler you know what to do about it now.

TC: Yes, Your Honor, thank you.

Keebler, the person referred to by the trial judge, was an OSI agent who had participated in that part of the interrogation during which the accused made the incriminatory statements in issue. Keebler's testimony, in the form of a stipulation of expected testimony, had been presented by the defense. The stipulation, however, was not presented to the court members during the trial, and they did not receive it as an exhibit they could consider during their deliberation on the verdict. Also, the accused did not testify before the court members, as he had at the Article 39(a) session. As a result, the evidence as to the voluntariness of the pretrial statements before the trial judge at the hearing to determine their admissibility is materially different from that before the court members. As the necessity to instruct the court members on an issue depends upon the existence of evidence presented to them to raise the matter, our "duty" is to review only that evidence adduced before the court members. *United States v. Graves*, 23 U.S. C.M.A. 434, 436, 50 C.M.R. 393, 395, 1 M.J. 50, 52 (1975); *United States v. Howard*, 18 U.S.C.M.A. 252, 257, 39 C.M.R. 252, 257 (1969).

All the evidence as to the circumstances under which the accused made the oral

statements appears in the testimony of Special Agent Hogue. On the afternoon of February 20, 1975, he was investigating two fires, in different barracks on the base, that "appeared to be . . . arsons." In the course thereof, he "developed" the accused as a suspect. About midnight, he went to the accused's barracks "specifically" to look for him. He met the accused in a hallway of the barracks. He approached him and asked him for his I.D. card. The accused gave it to him, inquiring "what was going on." Hogue informed him that there had been a fire in two barracks nearby and he was "just conducting a general investigation around the area." He asked the accused such questions as "where he had been" and "if he knew anything." What, if any, answers were given by the accused does not appear. Hogue's testimony then skips to the Security Police Operations Station on the base, to which the accused had been "transported" by Sergeant Zion of the security police.

The accused arrived at the police station about 12:45 a.m. Two enforcement officers, Hogue and Sergeant Zion, conducted the "interview" with him. Keebler was Hogue's assigned assistant, but as he was "still at the fire scene," Zion was present as his substitute. Hogue testified that the "preinterview," which consisted of "just talking . . . about generalized subjects," began about 1:00 a.m. After this discussion, he "then told . . . [the accused] that I wanted to talk to him about some fires that occurred on that evening and on previous occasions." He informed him of his rights, and "established" that the accused understood them and was willing to talk "concerning the incidents," without consulting or having an attorney present. At that point, Zion assumed the burden of the "interview."

Zion talked about the fires and "very shortly" told the accused he "felt" he was responsible for them. He repeatedly enjoined the accused to admit them, but the accused persistently denied involvement. Zion insisted the accused "had lied before," and he "knew . . . [he] was lying" again. As the interrogation proceeded in this mode, the accused "became antagonistic" toward Zion and Zion "seemed to respond" to the antagonism. Hogue indicated that for about 45 minutes "after this animosity developed," Zion kept charging the accused with setting the fires and the accused kept insisting that he did not do so. His only role, however, was some "minor questioning" of the accused as to his whereabouts. Zion was "aggressive" and "abrasive" toward the accused, but Hogue was "more or less passive." About 2:00 a.m. Hogue called "a break" because he could not "see" the interview "going on any further in the manner" in which it was proceeding. He asked Zion to leave the room.

As soon as Zion had left, Hogue approached the accused. He seated himself at the edge of the table, next to the accused's chair. His testimony as to what then occurred is as follows:

A. . . . I asked him . . . said, "looked like you made Sergeant Zion mad", and he said, "yes he did", and I said, "it appeared he made you a little bit mad also", and he said, "yeah", or replied in the affirmative; and then I said, "between you and me did you do it?" . . . "or did you start the fires", I can't remember specifically what I said; and at which time he said, "yes I did", but I believe he added to that, "you have to prove it".

Q. What happened after that?
A. I walked out of the interview room.
   . . .

On cross-examination, Hogue repeated the conversation in almost the same words he had used during the direct examination, but he did not mention his belief that after the accused acknowledged commission of the arsons, he added "you have to prove it."

After leaving the accused, Hogue met Sergeant Zion and Agent Keebler in the corridor outside the interrogation room. He informed them of "what had just transpired," adding that he did not know whether the accused was "joking," but he was sure the interview should be continued

with Keebler instead of Zion being present. He and Keebler returned to the interrogation room. The accused was advised that Keebler was "replacing Zion," and that the interrogation "would continue." Hogue reminded the accused he was "still under his advisement of rights," which he "reiterated." The accused indicated he was "still willing to talk" and he "did not need a lawyer."

As described by Hogue, the interrogation proceeded according to a pattern under which the agents would recite some details of a particular fire, then ask the accused if he had set it; on receiving a denial, they would ask the accused to assume that "this was something you would do" and to indicate how he "would . . . go about doing it." The accused obliged, stressing that as he would not have any desire to "destroy" but only to produce "excitement," he would set the sort of fire that would activate a heat sensor alarm. From time to time, he interjected that "if . . . [he] started the fires," it was the agents' "job to prove it." After nearly 2 hours of this kind of interchange, the accused suddenly remarked, without apparent reference to a particular question, "Hey, man, I set the fires." Hogue maintained that the statement "wasn't good enough," and the accused "would have to prove" he had set the fires. During the next 35 minutes, they went through a "chronological breakdown" of the fires, with the accused detailing his actions in regard to each.

Appellate Government counsel perceive Hogue's "between you and me" remark to the accused during the interrogation at the Security Police Station as the only evidence suggestive of a circumstance affecting the voluntariness of the pretrial statements. It would seem, however, that Hogue's earlier questioning of the accused in the corridor of the barracks, without apparently first advising him of his right to remain silent, should also be considered. See Article 31, UCMJ, 10 U.S.C. § 831. For the purpose of this appeal, we assume, as both the Government and defense counsel appear to assume, that the two periods of questioning were so unconnected that the possible taint of the

first had no effect upon the accused. *Cf. Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). We turn, therefore, directly to the substance of Government counsel's contention that Hogue's remark is so similar to that which was before the Court in *United States v. Payne*, 6 U.S.C.M.A. 225, 19 C.M.R. 351 (1955), as to require the conclusion that it did not raise an issue as to the voluntariness of the accused's statements. Appellate defense counsel acknowledge the relevance of *Payne*, but insist there are such differences of fact that the case cannot be regarded as dispositive of the issue before us.

■ *Payne* is instructive, but not determinative. For one thing, the issue here is not the same as the issue in *Payne*. There, the question was whether sufficient evidence of the voluntariness of the accused's pretrial statement was presented by the Government to support a ruling by the trial judge (then the law officer) that the statement was not obtained in violation of Article 31 of the Code, and was, therefore, admissible into evidence against the accused; here, the question is whether, as regards a statement already admitted into evidence at a hearing outside the presence of the court members, there is evidence before the court members sufficient to require the trial judge to instruct them that, before considering the content of the statement, they must find, beyond a reasonable doubt, that it was made voluntarily. The standard of appellate review for each of these issues is not the same. Further, where *Payne* was tentative as to the effect of a promise of confidentiality made by an agent to an accused or suspect undergoing interrogation, it is now settled principle that, notwithstanding preliminary advice to an accused or suspect that he has the right to remain silent and if he chooses to speak, anything said by him can be used against him in a court-martial, a subsequent assurance or promise of confidentiality by the agent, if relied upon by the accused as an inducement to speak, negates the advice and renders inadmissible, a statement by accused. *United States v. Hundley*, 21 U.S.

C.M.A. 320, 45 C.M.R. 94 (1972); *United States v. Yaeger*, 15 U.S.C.M.A. 226, 35 C.M.R. 198 (1965); *United States v. Dalrymple*, 14 U.S.C.M.A. 307, 34 C.M.R. 87 (1963).

As indicated in *Payne*, two questions are raised by a statement of the kind made by Hogue. The first is whether it can be construed as a pledge that the response of the accused will not be disclosed; the second is what impact did the statement have on the accused. In *Payne*, with no other persons present, two agents questioned the accused as to his use of narcotics; he steadfastly avoided incriminating admissions. After a time, one of the agents left the room; the remaining agent then said to the accused, "Man to man, just between you and I, when was the last time you used narcotics." The accused looked around the room, laughed and replied that he had done so the day before he had been apprehended; but, he added, as he and the agent "were the only ones in the room," the agent "didn't have any witnesses" and "his words were as good as" the agents. 6 U.S.C.M.A. at 228, 19 C.M.R. at 354. A majority concluded that the trial judge could have found that the accused's decision to respond to the agent's question was not influenced by any belief that the reply would be kept secret. As we view Hogue's representation and the circumstances under which it was made, we are satisfied they could generate in the minds of the court members a reasonable doubt that no ordinary, prudent person could have regarded the representation as a promise of secrecy. Not only is a promise of secrecy implied by words used by Hogue, but the implication is strengthened by the role of sympathetic and solicitous "good guy" that he had played, inadvertently or intentionally, in the "Mutt and Jeff" routine by which the questioning was carried on. *See Miranda v. Arizona*, 384 U.S. 436, 452, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, the question as to the nature of Hogue's representation, must be resolved in the accused's favor.

■ Turning to the effect of Hogue's representation on the accused, it will be recalled that Hogue's testimony is equivocal as to whether the accused "added" to his confession the words, "you have to prove it." During his direct examination, Hogue went no further than to express his belief that the comment was made; on cross-examination, when asked to repeat his conversation with the accused, he made no mention of the addition of any words to the admissions of guilt. Thus, unlike *Payne*, where there was no doubt that the accused made the statement attributed to him, the evidence in this case leaves room to doubt that the accused uttered the words under review. Moreover, in *Payne*, the Court held only that the trial judge could have construed the words of the accused as indicating he was not influenced in his decision to speak by the implied promise of secrecy; here, the court members, not the trial judge, had to determine the meaning of the accused's remark, but they were not informed of that responsibility. On the evidence before them, the court members could have been left with a reasonable doubt as to the meaning of the words, with the result that they might not have found beyond a reasonable doubt that the accused was not induced or influenced to speak by Hogue's representation. We conclude, therefore, that an issue as to voluntariness was raised before the court members, and they should have been instructed on the matter. That issue carried over to the latter statements of guilt made by the accused. *Brown v. Illinois, supra; United States v. Wimberley*, 16 U.S.C.M.A. 3, 36 C.M.R. 159 (1966).

■ Despite the judge's failure to instruct, Government counsel discern a basis for affirmance of the accused's conviction in *United States v. Meade*, 20 U.S.C.M.A. 510, 43 C.M.R. 350 (1971). In that case, the Court held that instructional error of the kind present here was waived by the accused. However, *Meade* has been overruled to the extent that it is "contrary to the views expressed" in the Court's opinion in *United States v. Graves, supra*, 23 U.S.C.M.A. at 437, 50 C.M.R. at 396, 1 M.J. at 53.

*Graves* emphasizes that the duty to instruct the court members, on an issue raised by evidence presented to them, rests upon the trial judge; and an appellate tribunal will not disregard the judge's neglect of that duty because defense counsel did not request the required instruction or did not object to the judge's omission. What part of *Meade* may still be viable need not detain us. As in *Graves*, the trial evidence in this case raised an issue as to the voluntariness of accused's pretrial statements, but the judge gave no instruction on the subject. The omission did not result from affirmative action by the defense directed to that end. *Cf. United States v. Minnifield*, 9 U.S.C.M.A. 373, 26 C.M.R. 153 (1958). Accordingly, we are bound to take account of the error and its prejudicial impact upon those offenses to which the accused pleaded not guilty. *See United States v. Wagner*, 18 U.S.C.M.A. 216, 218, 39 C.M.R. 216, 218 (1969).

The decision of the United States Air Force Court of Military Review is reversed as to Additional Charges I, II and III, and their respective specifications and the sentence; the findings of guilty as to the specified charges and the sentence are set aside and the record of trial is returned to the Judge Advocate General for resubmission to the court. In its discretion, the court may order that the record of trial be forwarded to a competent convening authority for a rehearing as to the cited charges and the sentence, or it may dismiss those charges and reassess the sentence upon the basis of the remaining findings of guilty.

Chief Judge FLETCHER and Judge PERRY concur.