UNITED STATES

v.

Richard M. WOLFF, 044 26 8060,
Aviation Electronics Technician,
First Class (E–6), U. S. Navy.

NCM 77 1301.

U. S. Navy Court of Military Review.

Sentence Adjudged 2 April 1977.

Decided 15 Sept. 1978.

CAPT Joseph F. Smith, USMCR, Appellate Defense Counsel.

CAPT Geoffrey D. Fallon, USMCR, Appellate Government Counsel.

1stLT Craig L. Kemmerer, USMCR, Appellate Government Counsel.

Before BAUM, GLADIS and GRANGER, JJ.

GRANGER, Judge:

■ Appellant was convicted by general court-martial of premeditated murder, felony murder and robbery.[1] He was sentenced to confinement at hard labor for life, forfeiture of all pay and allowances, a fine of $4,716.07, reduction from pay grade E–6 to pay grade E–1, and separation with a dishonorable discharge.

The murder victim, Ship Serviceman First Class Clark, was assigned as cashier at an officers' club at Okinawa, Japan. On 30 November 1976, Clark went to a local bank to transact club business. He left the bank with almost $5,000 in American and Japanese currency. He did not return to work and was never again seen alive. His body, with hands and feet bound, was found in a cane field on 8 December 1976. He had been shot twice in the head.

A sailor named Drake testified that, several days prior to the murder, appellant told him that appellant and his wife were going to rob Clark. Drake further testified that appellant admitted the murder shortly after it occurred on 30 November.

Drake's testimony was corroborated by circumstantial evidence. Appellant had been deeply in debt before the murder, but paid debts and spent money lavishly shortly after Clark was killed. A search of appellant's hotel room resulted in the seizure of appellant's blood-stained shirt. Blood on the shirt matched Clark's blood type. Appellant had been seen with Clark on the day of the killing and was seen alone in the victim's car later that day. Finally, tests showed that Clark had been killed with appellant's .22 caliber pistol.

Appellant was represented by able counsel at trial and before this Court. We commend them for their diligence and skillful advocacy. Counsel at both levels urge that appellant's conviction must be set aside. We have examined their many assignments of error, some of which are discussed below, and we conclude that no prejudicial error was committed.

*Right to six-member court-martial.*

■ Appellant contends his trial by a five-member court-martial deprived him of due process of law as guaranteed by the Fifth Amendment to the Constitution. He argues that a court-martial of less than six members is too small to consistently attain that quality of justice demanded by due process, and he relies upon *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), which held that the Sixth Amendment right to a jury trial, applicable to the states through the Fourteenth Amendment, requires that juries in the more serious cases be comprised of not less than six members.

Appellant does not argue that the Sixth Amendment entitles service members to a jury trial. It is well settled that it does not. *See United States v. Kemp*, 22 U.S.C.M.A. 152, 46 C.M.R. 152 (1973); *H. Moyer, Justice and the Military*, § 2–585 (1972). He contends, however, that the court-martial, mandated by statute [Article 16, Uniform Code of Military Justice (UCMJ), 10 USC § 816], and the jury, mandated by the Sixth Amendment, share the common function of rendering decisions through a process of group deliberation. The Supreme Court in *Ballew v. Georgia, supra*, found that the quality of justice provided by group deliberation decreases as the size of the group is reduced, to the point that the product delivered by groups of less than six is unacceptably poor. For this reason, the High Court held that Ballew was denied Fourteenth

---

1. Although there was but a single victim in this case, it is not error to charge an accused with premeditated murder and felony murder, nor is it error to affirm convictions of both offenses. *See United States v. Smith*, 13 U.S.C.M.A. 553, 33 C.M.R. 85 (1963).

Amendment due process when he was tried by a jury of less than six members. By the same rationale, appellant contends, trial by a court-martial comprised of fewer than six members deprives the accused of Fifth Amendment due process.

Appellant also attacks the legality of his five-member court-martial from another direction. The Fifth Amendment due process clause embodies concepts of equal protection. *United States v. Courtney,* 1 M.J. 438 (C.M.A. 1976). Appellant contends that, inasmuch as the quality of justice rendered through group deliberation diminishes with the reduction in the number of members composing the court, and the size of courts-martial varies from one case to another, some accused persons get more justice than others, so to speak. Since he was tried by the smallest general court-martial permissible, and some other accused service members are tried by larger courts-martial, appellant contends he has not received equal protection under the law.

Both of these contentions rely upon the *Ballew* rationale that the quality of justice varies proportionately with the number of members in the deliberating body. We find no evidence in the record to support this premise when the rationale is applied to courts-martial, and we are unwilling to adopt and apply the empirical data referred to in *Ballew*. That data was compiled in the civilian community from juries randomly selected to represent a cross-section of the civilian community. Courts-martial are not selected in that manner. Rather, they are deliberately chosen on the basis of who is best qualified to sit as a court member. Article 25, UCMJ, 10 U.S.C. § 825; *see United States v. Kemp, supra; United States v. Greene,* 20 U.S.C.M.A. 232, 43 C.M.R. 72 (1970); *United States v. Crawford,* 15 U.S.C.M.A. 31, 35 C.M.R. 3 (1964). The *Ballew* data simply is inapposite.

There is no showing that a five-member court-martial does not render the same quality of justice as does a larger court. There is no indication that appellant did not receive precisely what the Congress contemplated when it enacted the Uniform Code of Military Justice in the exercise of its constitutional power to make rules for the government and regulation of the land and naval forces. That is the due process to which appellant is entitled. *DeWar v. Hunter,* 170 F.2d 993 (10th Cir. 1948), *cert. denied* 337 U.S. 908, 69 S.Ct. 1048, 93 L.Ed. 1720 (1949). We conclude that appellant has suffered no due process deprivation.

*Failure to arraign.*

■ Paragraph 65a, *Manual for Courts-Martial, United States, 1969* (Revised edition) (MCM) describes arraignment as a two-step process that includes the reading of the charges, or waiver of that reading, and the calling for pleas from the accused. Here, although appellant was called upon to plead, he says he was not arraigned because his pleas were not preceded by a reading of the charges or waiver thereof. We agree that the arraignment process did not meet the Manual requirements. We are convinced, however, that appellant was not prejudiced by this error.

The purpose of arraignment is to ensure in a formal and ritualistic manner that the accused is aware of the charges against him and that he is protected against a second prosecution for the same misconduct. Both ends were met in this case.

The charges were timely served on appellant. At an Article 39(a), 10 U.S.C. § 839 (a), session prior to trial, the military judge stated that he had shown a copy of Appellate Exhibit XVIII, which was the charges, to the defense. Shortly before accepting appellant's pleas, the military judge showed the defense a copy of the charges to be placed before the members (Appellate Exhibit XXC), which accurately reflected the charges upon which appellant was tried. Shortly after pleas were taken, the judge explicitly described to the members, in the presence of appellant, what the charges were, and he again showed the defense a copy of them prior to delivering them to the members. Further, appellant had successfully urged that the charges were duplicitous, and that motion had been extensively litigated prior to pleas.

Appellant unquestionably knew what the charges were, and he is adequately protected against a second prosecution. No remedial action is required. *United States v. Napier*, 20 U.S.C.M.A. 422, 43 C.M.R. 262 (1971).

*Qualification as expert witness.*

■ A Government witness, Tomikawa, testified that he had examined appellant's pistol and two bullets taken from the victim's head, and he was of the opinion that the bullets were fired from appellant's gun. Appellant challenged Tomikawa's qualifications as a ballistics expert and now contends that the military judge erred in permitting the witness to testify as an expert.

The witness had a college degree in physics and had been employed as a firearms examiner in the Scientific Examination Laboratory of Okinawa Prefectural Police Headquarters for 20 years. He was the chief of firearms examination and had special schooling in firearms examination. He had taught in that field, received awards, and appeared as a witness in approximately 60 criminal proceedings. The witness was obviously an expert in the field of firearms examination.

Appellant would distinguish between firearms examiners and ballistics experts. The record will not support such a distinction, however. Tomikawa testified that a firearms examiner conducts tests on "everything concerning firearms," including examinations to determine the kind of bullet, what weapon a given bullet was fired from, and how many firearms were employed in an offense.

Another witness, Hamby, whose expert qualifications were readily conceded by the defense, described "standard firearms identification" examination of bullets to include visual examination, stereoscopic-microscopic examination, weighing, and examination with a comparison identification microscope. He further testified that a firearms examiner could determine the caliber of bullets.

Further, Tomikawa's testimony about comparison analysis, striations, and lands and grooves demonstrated considerably more knowledge in this field than is possessed by the average person. The witness was shown to be an expert by military law standards. *See United States v. Jones*, 20 C.M.R. 438 (A.B.R. 1955), *aff'd*, 7 U.S.C. M.A. 283, 22 C.M.R. 73 (1956); *J. Munster and M. Larkin, Military Evidence* § 8.13 (2d ed. 1977). Appellant's assignment of error is without merit.

*Admissibility of appellant's statements.*

■ It was the theory of the Government's case that appellant planned, well in advance, to rob Clark and that appellant also necessarily planned to kill Clark as the only way to avoid detection. To show that these crimes were premeditated, the Government showed that appellant was living well beyond his means, anticipating some extraordinary financial gain. The Government argued that appellant's need of money provided the motivation for these crimes.

For the first time on appeal, appellant contends that some of the evidence showing his indebtedness was inadmissible because it was elicited from him without warning of his right against self-incrimination.

Commander Briggs, appellant's executive officer, testified that he became aware that appellant was in debt when he received letters and telephone calls from people who told him that "checks were bouncing and that money was being owed." He began counseling appellant regarding this indebtedness and, during the course of their counseling sessions, he suggested that appellant make a chart showing debts owed and anticipated installment payments to be made, in order that the creditors could be appeased and the debts systematically discharged. Appellant did this. An orderly payment plan was formulated and apparently accepted by the creditors, and appellant faithfully adhered to the payment schedule during the ensuing months prior to the murder.

About one week before the murder, appellant sent Commander Briggs a letter

thanking him for his efforts and his faith and trust, and professing that such assistance had helped appellant extricate himself from his financial difficulties and renew his pursuit of a successful Navy career.

Appellant contends that the debt and payment schedule, Prosecution Exhibit 32, was erroneously admitted in evidence because it was elicited from him without proper warning, Article 32, UCMJ, 10 U.S.C. § 832 and that the "thank you" letter, Prosecution Exhibit 33, was inadmissible because it was "fruit of the poisonous tree."

Appellant's counseling sessions began in April or May, 1976, and there is no indication that Commander Briggs had reason to suspect appellant of any criminal offense at that time. In June or July, the Naval Investigative Service (NIS) initiated an investigation into matters not shown to be related to anything discussed by Commander Briggs and appellant. The record reflects that appellant's commanding officer was in favor of "taking legal action" against appellant for the investigated offenses and that NIS ultimately believed there was sufficient evidence to support charges. Appellant submitted Prosecution Exhibit 32 prior to completion of this NIS investigation, however, and the commanding officer never charged appellant with any offense. It is clear that Commander Briggs was convinced that appellant fully intended to pay his debts.

We conclude that appellant was not a suspect at the time he constructed Prosecution Exhibit 32. Accordingly, a warning was not required, and Prosecution Exhibit 32 was admissible. It follows that Prosecution Exhibit 33 was not "fruit of the poisonous tree," and was also admissible. We would reach this conclusion as to Prosecution Exhibit 33 even were we to conclude that appellant was a suspect, because Prosecution Exhibit 33 was an unsolicited, spontaneous expression of gratitude not associated with or tainted by the earlier admission of indebtedness.

Further, assuming *arguendo* that these two exhibits were inadmissible, we find that appellant affirmatively waived any objection to that evidence.

The evidence of appellant's serious financial problems did not come solely from Commander Briggs. Elsewhere in the record, it is shown that appellant was scheduled to leave Okinawa in early December for reassignment to duty in the United States. He moved out of his rented apartment almost one month before his anticipated departure date and moved into an expensive hotel. He owed money to his former landlord as well as to the hotel. Months before the murder, appellant's wife had given a "bad check" to a local merchant, and this $480 debt had not been paid. Two days before the murder, appellant and his wife had agreed to purchase some expensive art work for about $2,000. Appellant had made plans as early as 22 October to refuse military air transportation to the United States and had purchased commercial airline tickets, simply because it was more convenient to fly commercially. He had also made reservations for a "second honeymoon" at the Mark Hopkins Hotel in San Francisco. He was committed to give or loan $600 to an acquaintance prior to leaving Okinawa. Most of these obligations were discharged shortly after the murder, and appellant had at least $500 cash on 3 December.

That appellant could not afford such expenditures was shown by evidence of his income, and by the fact that on 22 November—8 days before the murder—appellant tried to borrow $150 from a fellow service man.

It is also significant that Commander Briggs' testimony, that he had counseled appellant on many occasions during the months preceding the murder, would have been admissible even if all of appellant's admissions had been ruled inadmissible. Evidence of command pressure directed toward appellant to resolve financial difficulties was admissible to show motive, independent of any statements or admissions by the appellant.

Appellant's only means to negate the Government's motive evidence was to show that he did not need the money taken from

Clark. He testified that he had accumulated about $1,350 in savings during the months preceding the murder and had secretly maintained this money in a locker at his work spaces. He stated that not even his wife knew of some of these savings. Appellant further testified that on 30 November—the last day Clark was seen alive—a Japanese man came to Okinawa from Tokyo, met appellant at an A & W Root Beer stand, and presented him with the equivalent of $2,500 in yen. This money represented the proceeds of an unsecured loan appellant had arranged some months before. Although appellant testified he had gone to Tokyo and personally applied for the loan, he was unable to recall the name of the loan company or its address. He testified that he asked to borrow $150 at work because it was inconvenient and time-consuming to walk down to his locker where he maintained his savings.

It is clear that appellant was under great financial strain, and the Government was able to show that without Prosecution Exhibits 32 and 33. There was little to be gained by the defense if these exhibits were excluded. On the other hand, these exhibits were valuable to the defense. They tended to show that, contrary to the Government's assertions, appellant was not a debtor beleaguered by creditors, and was not in financial waters over his head, but was instead a man who, one week before the murder and robbery, felt he had his house in order and had solved his financial problems. This was the thrust of trial defense counsel's argument to the court members. Commander Briggs' testimony and the documentary evidence introduced through him, lent an air of legitimacy to appellant's otherwise unsubstantiated and improbable story.

Appellant was represented by experienced lawyers, whose expertise in military law regarding confessions and admissions was demonstrated throughout the trial. We are convinced that the failure to challenge the voluntariness of these statements was not inadvertent, but was the result of a well-reasoned conclusion that the defense was better off with this evidence than without it. Appellant affirmatively waived any objection in this regard. *United States v. Gustafson*, 17 U.S.C.M.A. 150, 37 C.M.R. 414 (1967).

*Failure to instruct on voluntariness.*

■ Appellant next contends that, even if he waived any objection to the admissibility of this evidence, he could not waive an instruction regarding it. Defense counsel explicitly declined to have such an instruction given, after being three times reminded he could have it. Appellant now argues, however, that it was incumbent upon the judge to instruct the members that they must disregard the testimony of Commander Briggs as to appellant's admissions and Prosecution Exhibits 32 and 33 unless they determined that this evidence was lawfully obtained. Appellant cites *United States v. Hanna*, 2 M.J. 69 (C.M.A. 1976) and *United States v. Graves*, 1 M.J. 50 (C.M.A. 1975), which require an instruction on voluntariness when that issue is raised by the evidence, irrespective of the desires of counsel.

This case is distinguishable from the cited authorities, because here the issue of voluntariness was never raised. The evidence before the members showed only that appellant owed money and that his checks were returned unpaid. Owing money is not a criminal offense, *see United States v. Schneiderman*, 12 U.S.C.M.A. 494, 31 C.M.R. 80 (1961), and there is no direct evidence, or evidence giving rise to an inference, that appellant intended to defraud anyone with worthless checks. *See* paragraph 202A, MCM. The judge did not err by acceding to appellant's desires and not instructing on this issue.

*Military judge's out-of-court remarks.*

■ During the course of the trial, the military judge attended a farewell party for a general officer stationed on Okinawa, as did the president of this court-martial and appellant's individual military counsel. While the judge was seated for dinner at a table shared by the Psychiatrist, Marine Corps Base, Camp Butler, Okinawa, and a

lady, the dinner conversation turned to medical testimony at trials. The judge remarked that Doctor Shimer, a pathologist, had recently testified in the present case and was very professional in his appearance, but that the judge could not discuss the matter further because the case was yet in progress. The president of the court-martial was not privy to this conversation.

At an Article 39(a) hearing the following week, defense counsel examined the military judge on *voir dire* regarding this conversation. The judge recounted his remark and stated that he made no comment about the credibility of the witness or the substance of his testimony. Counsel made no objection or challenge in light of this revelation, and indicated that he was already aware of the identity of the psychiatrist with whom the judge had the conversation.

After the trial had progressed another week, and after the judge made an evidentiary ruling adverse to appellant, defense counsel challenged the military judge for cause on the grounds that he had abandoned his impartial role. The challenge was denied. Appellant urges that the judge erred in failing to recuse himself after making the remark discussed above, and he cites ABA Standards, The Function of the Trial Judge §§ 1.5, 1.6, 1.7 (1972).

We find that the military judge made no reference to the credibility of the witness or to the accuracy of his testimony, and there is no fair risk that his remark could have been interpreted as such. It is clear from his stated reservation to the effect that he could not discuss the case further, that he measured his words before he spoke. The reasonable interpretation to be given his remark is that the judge was talking about what he saw, and not about the substance of what he heard. He was impressed with the witness's appearance and comportment. The witness could have made that impression whether or not he was telling the truth or knew what he was talking about.

Further, assuming the military judge's remark was improper—and we are quick to observe that it was imprudent in any light—appellant was not prejudiced by it.

The judge was not the trier of fact. Owing to the judge's rulings on various Government and defense challenges of members, appellant was tried before a court-martial practically hand-picked by his counsel. There is no indication that any member was aware of the judge's remark. A reading of the record discloses that the judge was extremely careful to ensure that appellant received a fair trial. No one could read the record and conclude that the judge was biased against appellant.

We are convinced that the trial was conducted in such a manner as to leave no "substantial doubt as to the legality, fairness and impartiality" of the proceedings. Paragraph 62*f*(13), MCM; *See United States v. Head*, 2 M.J. 131 (C.M.A.1977). Appellant's assignment of error is without merit.

We would also observe that when counsel perceives that the judge is disqualified, counsel should challenge him. Counsel cannot "lie behind the log," allowing the trial to progress and the record to build, and make his challenge a week later when things do not seem to be going his way.

*Legality of post-trial confinement.*

▮ Prior to filing his brief on the merits, appellant filed a petition for extraordinary relief, alleging that he was being denied due process of law because of infirmities in the military parole system. He asserted that Department of the Navy parole regulations set forth no adequate standards and criteria governing parole determination. He also complained of parole hearing procedures which, he asserted, fail to protect his substantial rights and thereby deny him due process. He moved for a writ of mandamus ordering the Secretary of the Navy to promulgate regulations remedying these purported deficiencies. That motion was denied. *Wolff v. Secretary of the Navy*, No. 77 1301 (N.C.M.R. 8 December 1977).

Appellant now incorporates this motion as an assignment of error for consideration on the merits. In oral argument, appellate

defense counsel confirmed that the relief he seeks is extraordinary relief—in effect, a reconsideration of his prior motion. Upon reconsideration, we again deny appellant's motion for extraordinary relief.

We must nevertheless determine whether appellant's sentence, including his adjudged confinement, is correct in law. Article 66, UCMJ, 10 U.S.C. § 866. We find no indication in the record that appellant is not lawfully confined. Further, a review of pertinent Department of the Navy regulations reveals that appellant's complaints regarding a denial of due process are without merit. *Franklin v. Shields*, 569 F.2d 784, 800, 801 (4th Cir. 1977).

We have examined appellant's remaining assignments of error and find no merit to them. The findings and sentence as approved below are affirmed.

Senior Judge BAUM and Judge GLADIS concur.